**SECURITIES AND EXCHANGE COMMISSION, Appellee,**

v.

**Paul A. BILZERIAN, Appellant.**

**Nos. 91–5187, 93–5050.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1993.

Decided July 22, 1994.

Paul A. Bilzerian, pro se.

Judith R. Starr, Counsel, S.E.C., Washington, DC, argued the cause for the appellee. On brief were Paul Gonson, Sol., Eric Summergrad, Principal Asst. Gen. Counsel, and Lucinda Burwell, Counsel, S.E.C., Washington, DC. Jacob H. Stillman and Brian D. Bellardo, Washington, DC, also entered appearances.

Before SILBERMAN, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Paul A. Bilzerian appeals two district court orders entered against him in favor of the Securities and Exchange Commission (SEC). First, Bilzerian appeals the order granting partial summary judgment to the SEC on its claims that Bilzerian violated numerous securities laws and permanently enjoining him from further violations. Second, Bilzerian challenges the order that he disgorge $33,140,787, representing the profit he obtained from his securities law violations. 814 F.Supp. 116. We affirm both orders.

## I.

Before the commencement of this civil action, Bilzerian was convicted in the United States District Court for the Southern District of New York of numerous violations of the federal securities laws. He was sentenced to four years in prison, fined $1.5 million dollars and ordered to perform 250 hours of community service.[1] The Second Circuit affirmed Bilzerian's convictions in all respects. *See United States v. Bilzerian,* 926 F.2d 1285 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991).

---

1. The court subsequently granted Bilzerian's post-conviction motion to reduce his prison sentence to twenty months. *See United States v.* *Bilzerian,* 1992 WL 301390 (S.D.N.Y. Sept. 2, 1992).

The same conduct that led to Bilzerian's criminal convictions forms the basis of the SEC's civil action against him. In 1985 and 1986, Bilzerian accumulated substantial blocks of stock in Cluett, Peabody and Company (Cluett) and Hammermill Paper Company (Hammermill) through a stock accumulation agreement with Jefferies & Company (Jefferies), a broker-dealer registered with the SEC. Under the terms of the accumulation agreement, Jefferies purchased stock in its own account and Bilzerian agreed to buy the stock on a specific future date at Jefferies' cost plus interest and commissions. Although Bilzerian was the beneficial owner of the stock at all times after the agreement was entered into, Jefferies remained the record owner until the date on which Bilzerian bought the stock.[2] Bilzerian used his stock accumulation agreement with Jefferies to conceal the extent of his ownership of Cluett and Hammermill stocks in order to delay filing a required form, Schedule 13D, with the SEC.[3] When Bilzerian eventually disclosed his accumulations of Cluett and Hammermill stocks to the SEC, he misrepresented the source of funds used to purchase the stocks. Bilzerian certified that he had used "personal funds" to purchase the stocks when in fact he had obtained the funds from investors whom he had guaranteed against losses and granted a share in his profits. Bilzerian repeated the misrepresentations on the Schedule 14D–1 form he subsequently filed with the SEC.[4]

Bilzerian's misrepresentations were designed to create the impression that he was ready, willing and able to mount hostile takeovers of Cluett and Hammermill—if shareholders had known that Bilzerian had indemnified his investors against any losses, they would have questioned his financial ability to effectuate a hostile takeover. The purpose of Bilzerian's scheme was to induce a "white knight" to rescue the companies from his hostile takeover by purchasing stock, including his own, at a premium.[5] The scheme succeeded—Bilzerian sold his Cluett stock and his Hammermill stock at a substantial profit.[6]

Bilzerian's convictions were also based on his "parking" of H.H. Robertson Company (H.H. Robertson) and Armco Steel (Armco) stock with Jefferies. Under two separate

2. Bilzerian initiated the Cluett accumulation agreement with Jefferies on May 21, 1985. From May 21 to May 27, Jefferies acquired 302,-000 shares of Cluett stock for Bilzerian. Appendix (App.) of SEC at 1163. On June 26, 1986, Bilzerian and Jefferies entered into the Hammermill accumulation agreement. *Id.* at 1186. From June 26 to July 16, Jefferies acquired 551,-000 shares of Hammermill stock for Bilzerian. *Id.* at 1187.

3. Section 13(d)(1) of the Securities Exchange Act (Act), 15 U.S.C. § 78m(d)(1), requires a stock purchaser to disclose acquisition of beneficial ownership of more than five per cent of a company's equity securities within ten days of purchase. The disclosure is filed on a Schedule 13D form. Regarding the Cluett purchases, Bilzerian was required to file a Schedule 13D by May 31, 1985; he did not file, however, until June 4, 1985. *See* App. of SEC at 28. For the Hammermill purchases, Bilzerian was required to file by July 7, 1986, but he did not file until July 25, 1986. *See id.* at 31.

4. Section 14(d)(1) of the Act, 15 U.S.C. § 78n(d)(1), requires that an individual making a tender offer—an offer to stockholders of a publicly owned corporation to buy their shares at a price above the quoted market price, usually in order to effect a hostile takeover—file a statement with the SEC containing, among other information, the same disclosures required by section 13(d). On October 15, 1985, Bilzerian filed a Schedule 14D–1 announcing a tender offer for all outstanding shares of Cluett common stock. *See* App. of SEC at 1166. On July 25, 1986, Bilzerian filed a Schedule 14D–1 announcing a tender offer for all outstanding shares of Hammermill stock. *Id.* at 1183. In Bilzerian's Schedule 14D–1 for his Cluett tender offer, he failed to disclose that he had borrowed two million dollars to finance the tender offer. *Id.* at 1173. Bilzerian's Schedule 14D–1 for his Hammermill tender offer contained a similar misrepresentation—the form falsely identified ten million dollars used to acquire Hammermill securities as Bilzerian's personal funds. *Id.* at 1189.

5. A "white knight" is a stock bidder friendly to the management of the target company.

6. Based on this conduct, Bilzerian was convicted of violating section 10(b) of the Act, 15 U.S.C. § 78j(b), and the rules promulgated thereunder for the misrepresentations and omissions in his Schedules 13D and 14D–1. Bilzerian was also convicted of violating 18 U.S.C. § 1001 for making false statements on his schedules. Finally, Bilzerian was convicted of criminal conspiracy under 18 U.S.C. § 371 based on his schemes to accumulate Cluett and Hammermill shares in violation of section 13(d).

"stock parking" agreements between Bilzerian and Jefferies, Jefferies bought stock from Bilzerian with the understanding that Bilzerian would buy the stock back on a future date for the purchase price plus interest and commission. These agreements, like Bilzerian's accumulation agreements, served the purpose of concealing his beneficial ownership of the stock. In order to mask the agreements, Bilzerian and Jefferies exchanged a number of false invoices.[7]

The district court issued two orders that Bilzerian now appeals. The first order granted partial summary judgment to the SEC on its claims that Bilzerian had violated certain securities laws and regulations and accordingly enjoined Bilzerian from future violations. The court based its grant of summary judgment on the collateral estoppel effect of Bilzerian's criminal convictions. In its second order, the court ordered disgorgement of Bilzerian's illicit profits.

Bilzerian argues: (1) collateral estoppel was improperly applied by the trial court because his criminal convictions did not conclusively establish the facts necessary to conclude that he had committed the violations with which he was charged in this action; (2) the court erred in issuing a permanent in-junction on the SEC's motion for summary judgment because genuine issues of material fact existed; (3) the disgorgement order violates the double jeopardy clause of the fifth amendment; and (4) the court erred in calculating the amount to be disgorged.

## II.

■ Based on the collateral estoppel effect of Bilzerian's criminal convictions, the district court entered summary judgment on the SEC's claims that Bilzerian aided and abetted Jefferies' violation of section 7(c) and Regulation T and that Bilzerian himself violated sections 7(f), 10(b), 13(d), 14(d), 14(e) and 17(a)(1) of the Act; SEC Rules 10b–5, 13d–1, 13d–2, 14d–3, 14d–6, and 17a–3 promulgated under the Act; and Regulation X.[8] The doctrine of collateral estoppel prohibits relitigation of an issue of fact or law that has been decided in earlier litigation. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). The district court found that Bilzerian was collaterally estopped from contesting the facts set forth in support of the SEC's civil claims because the same facts formed the basis of his criminal conviction. Appendix (App.) of SEC at 792. Bilzerian argues that

7. Bilzerian was convicted, under 18 U.S.C. § 371, of criminal conspiracy to defraud the SEC and the Internal Revenue Service based on his Robertson and Armco dealings.

8. Section 7(c), 15 U.S.C. § 78g(c), makes it unlawful for a broker or dealer to directly or indirectly extend or maintain credit to any customer for the purchase of any security, other than an exempt security, without collateral.

Section 7(f), 15 U.S.C. § 78g(f), makes it unlawful to "obtain, receive or enjoy the beneficial use of a loan or other extension of credit from any lender ... for the purpose of ... purchasing ... United States securities."

Section 10(b), 15 U.S.C. § 78j(b), makes it unlawful to use any manipulative or deceptive device in connection with the purchase or sale of any security in violation of SEC rules and regulations.

Section 13(d), 15 U.S.C. § 78m(d), requires any person who acquires direct or indirect beneficial ownership of greater than five per cent of a company's class of securities to disclose *inter alia* the ownership to the SEC.

Section 14(d), 15 U.S.C. § 78n(d), requires any person making a tender offer to file and disseminate a statement containing certain specified information concerning the offer, including the source and total amount of funds for the tender offer, a description of all transactions in which funds were borrowed for the tender offer and a description of any arrangement regarding the shares of the company.

Section 14(e), 15 U.S.C. § 78n(e), makes it unlawful "to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made ... not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer."

Section 17(a)(1), 15 U.S.C. § 78q(a)(1), requires every broker or dealer to make and keep such records as the Commission prescribes.

Rule 10b–5, 17 C.F.R. § 240.10b–5, prohibits fraudulent, manipulative or deceptive practices in connection with the purchase or sale of a security. Rules 13d–1, 17 C.F.R. § 240.13d–1, and 13d–2, 17 C.F.R. § 240.13d–2, provide for the filing and amendment of Schedule 13D. Rules 14d–3, 17 C.F.R. § 240.14d–3, and 14d–6, 17 C.F.R. § 240.14d–6, provide for the filing of a tender offer statement. Rule 17a–3, 17 C.F.R. § 240.17a–3, imposes record keeping requirements on brokers and dealers. Regulations T, 12 C.F.R. §§ 220.1 *et seq.*, and X, 12 C.F.R. §§ 224.1 *et seq.*, supplement section 7(c)'s prohibition on extensions of credit by brokers and dealers.

the facts the SEC had to establish to prevail in its civil action were either not litigated in his criminal case or were not necessary to his convictions.

■ Specifically, Bilzerian argues that the district court erred in holding that his section 10(b) convictions estop him from challenging his civil liability under sections 13(d), 14(d) and 14(e) of the Act because the jury did not necessarily find that his misrepresentations were material as the SEC is required to establish under those sections. We disagree. Bilzerian appealed his criminal convictions on the ground that his misrepresentations and omissions were not material. The Second Circuit rejected his argument explaining that "[a]fter hearing the evidence in this case, the jury concluded that the misstatements and omissions were material." *United States v. Bilzerian*, 926 F.2d 1285, 1298–99 (2d Cir. 1991). The Second Circuit's holding conclu-

sively establishes the materiality of Bilzerian's misstatements and omissions; his argument that collateral estoppel is inappropriate because the jury never determined materiality accordingly fails.

■ Bilzerian also argues that his convictions did not establish the facts necessary to support the SEC's civil claims that he violated margin requirements [9] (Seventh Claim, App. of SEC at 1197 ¶ 154–56), aided and abetted Jefferies' margin violations (Eighth Claim, App. of SEC at 1197–98 ¶ 157–61) and aided and abetted Jefferies' falsification of records (Sixth Claim, App. of SEC at 1196 ¶ 149–53). Our review of the record indicates that Bilzerian's criminal convictions conclusively established all of the facts the SEC was required to prove with respect to the specified claims.[10] Accordingly, we affirm the district court's grant of partial summary judgment.

9. Margin requirements prohibit a broker from extending credit in order to purchase securities without obtaining collateral, *see* 15 U.S.C. § 78g(c), and prohibit a stock purchaser from obtaining credit from any lender, *see* 15 U.S.C. § 78g(f)(1).

10. The jury that convicted Bilzerian expressly found that he had intentionally accumulated Cluett and Hammermill stock through a nominee. J.A. at 174–75. Bilzerian's accumulation agreement allowed him to obtain beneficial ownership without making any payment. The accumulation agreements thus established that Bilzerian violated the Act's margin requirements.

The evidence also supports a finding that Bilzerian aided and abetted Jefferies' margin and record keeping violations, although there is now reason to doubt that he could be held civilly liable for such aiding and abetting. *See Central Bank of Denver v. First Interstate Bank of Denver, N.A.,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (specifically holding only that there is no private civil aiding and abetting liability under section 10(b) of the Act, but further suggesting that the Act contemplates no civil aiding and abetting liability at all, either private or administrative, under any section whose text "does not itself reach those who aid and abet" the violation, —— U.S. at ——, 114 S.Ct. at 1448).) In order to prove that Bilzerian aided and abetted Jefferies' violations, the SEC had to prove that Bilzerian had a "general awareness that his role was part of an overall activity that was improper" and that he substantially assisted in their violations. *See Investor's Research Corp. v. SEC,* 628 F.2d 168, 178 (D.C.Cir.1980). Bilzerian was generally aware that Jefferies had not received

the down payment required by the Act's margin requirements at the time it transferred beneficial ownership to him. He substantially assisted Jefferies' violation of the margin requirements by entering into the accumulation agreements with it—had he not done so, Jefferies could not have committed the margin violations. We reject Bilzerian's argument that he cannot be liable for aiding and abetting Jefferies' margin violations because he himself was convicted of violating the margin requirements. Overlap in securities laws liability, which often exists, does not limit the violations with which a defendant may be charged. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 383, 103 S.Ct. 683, 688, 74 L.Ed.2d 548 (1983) ("[I]t is hardly a novel proposition that the 1934 Act and the 1933 Act prohibit some of the same conduct. The fact that there may well be some overlap is neither unusual nor unfortunate.") (internal citations omitted).

Further, Bilzerian's criminal convictions sufficiently support his liability for aiding and abetting Jefferies' violations of the Act's record keeping requirements. Bilzerian was aware that Jefferies had not recorded his beneficial ownership of stock—indeed that was the purpose behind his agreement with Jefferies. He also substantially assisted Jefferies in its violations of the record keeping requirements—had he not entered into the accumulation agreements with Jefferies, Jefferies would not have violated the record keeping requirements.

Finally, Bilzerian's convictions established the facts necessary to support the district court's grant of summary judgment on the claims that his actions with respect to the Robertson and Armco stocks violated the Act's margin requirements and aided and abetted Jefferies' violation of the margin and record keeping requirements.

### III.

We review de novo the district court's grant of summary judgment to the SEC on its request for permanent injunctive relief. When a defendant has violated the securities laws, an injunction is appropriate if the court determines there is a reasonable likelihood that he will violate the laws again in the future. *See SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1228 (D.C.Cir.1989). In order to determine whether a reasonable likelihood of future violations exists, the court considers "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future." *Id.*

There is no genuine issue of material fact regarding whether Bilzerian's securities violations were part of a pattern or whether they were flagrant and deliberate in nature; they unquestionably were, as the brief summary of his conduct set forth earlier manifests. Courts have often found that the combination of these two factors justifies injunctive relief prohibiting future violations of the securities laws. *See, e.g., SEC v. Blatt*, 583 F.2d 1325, 1334–35 (5th Cir.1978) (nature and extent of securities violations warranted injunction); *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir.1975) (serious and intentional nature of defendant's conduct warranted injunction). Accordingly, we agree with the district court that injunctive relief is appropriate.

Bilzerian argues, however, that a genuine issue of material fact exists regarding whether his occupation provides him an opportunity to violate the securities laws. We disagree. Even assuming Bilzerian is correct, that circumstance would not make injunctive relief inappropriate. *See SEC v. Koracorp Indus.*, 575 F.2d 692 (9th Cir.) (changing occupations so that opportunity for securities laws violations is not readily available does not necessarily defeat injunctive relief), *cert. denied*, 439 U.S. 953, 99 S.Ct.

348, 58 L.Ed.2d 343 (1978). Moreover, the nature of Bilzerian's past violations indicates that, notwithstanding a change in occupation, he will nonetheless be able to violate the securities laws. Bilzerian's securities laws violations did not arise from a position of authority in a brokerage firm, or from any other position for that matter. They resulted from actions he took *as an investor.* Bilzerian will be able to commit similar violations so long as he is able to persuade people to finance his schemes.

Bilzerian also argues that he has given the court sufficient assurances against future violations to remove the need for a permanent injunction. Bilzerian's argument relies on his affidavit filed in the district court in which he declares that he "will be careful and make every effort to assure that [he does] not violate the federal securities law in the future." *See* App. of SEC at 478. If a defendant could survive summary judgment by simply submitting a self-serving statement about his desire to conform to the law in the future, it "would establish ... a ritualistic dodge around a permanent injunction on a motion for summary judgment." *SEC v. Murphy*, 626 F.2d 633, 656 (9th Cir.1980). We do not intend to provide Bilzerian with any such dodge. Because the other relevant factors counsel in favor of injunctive relief, Bilzerian's assertions do not alter our conclusion that summary judgment was appropriate.

Finally, Bilzerian argues that the district court was required to hold a hearing before entering a permanent injunction against him. Courts have approved the entry of a permanent injunction, however, on a motion for summary judgment based wholly on the facts established by the defendant's prior criminal conviction. *See SEC v. Gruenberg*, 989 F.2d 977 (8th Cir.1993) (injunction granted on summary judgment based on collateral estoppel effect of criminal convictions of securities laws violations); *SEC v. Everest Management Corp.*, 466 F.Supp. 167 (S.D.N.Y.1979) (same). Accordingly, we affirm the district court's grant of injunctive relief.

---

The jury in the criminal trial found that Bilzerian unlawfully conspired to accumulate Armco stock and to park Robertson and Armco stock with Jefferies. *See Bilzerian*, 926 F.2d at 1302. Accordingly, Bilzerian obtained beneficial owner-

ship of the stocks without making a down payment. Again, Bilzerian knew of Jefferies' violations and in fact substantially assisted in their commission.

## IV.

Bilzerian alleges that the disgorgement order violates the double jeopardy clause of the fifth amendment because it punishes him for the same conduct that led to his criminal convictions. The double jeopardy clause is violated when multiple punishments are imposed for the same offense. *See Schiro v. Farley*, —— U.S. ——, ——, 114 S.Ct. 783, 789, 127 L.Ed.2d 47 (1994). Bilzerian's imprisonment resulting from his convictions unquestionably constitutes punishment so that the only issue is whether the disgorgement order constitutes renewed punishment for the same conduct.

Bilzerian bases his argument on the Supreme Court's decision in *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989). He specifically relies on the Court's statement in *Halper* that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment." Accordingly, he argues that, because disgorgement is not *solely* remedial but also a type of deterrence, it is punishment within the meaning of the double jeopardy clause. We find Bilzerian's reliance on *Halper* misplaced.

The reach of the *Halper* decision is short. As the Court explained: "What we announce now is a rule for the rare case, the case such as the one before us, where a fixed penalty provision subjects a prolific but small-gauged offender to a sanction overwhelmingly disproportionate to the damages he has caused." Because the disgorgement order did not ask Bilzerian to give up anything in excess of the amount of his illicit gains, Bilzerian does not present "the rare case" contemplated by the Court in *Halper*.[11] Accordingly, we conclude that the disgorgement order is remedial in nature and does not constitute punishment within the meaning of double jeopardy.

Finally, we reject Bilzerian's argument that disgorgement constitutes punishment unless it is ordered to make the government whole. Disgorgement is no less remedial in nature merely because victims other than the government have been injured by Bilzerian's violations of the securities laws. The district court ordered Bilzerian to give up only his ill-gotten gains; it did not subject him to an additional penalty. Therefore the disgorgement does not constitute punishment. *See United States v. Tilley*, 18 F.3d 295, 300 (5th Cir.1994) ("[T]he forfeiture of illegal proceeds, much like the confiscation of stolen money from a bank robber, merely places that party in the lawfully protected financial status quo that he enjoyed prior to launching his illegal scheme. This is not punishment within the plain meaning of the word.") (internal citation omitted).

## V.

Finally, Bilzerian mounts two other challenges to the disgorgement order. Bilzerian first argues that disgorgement was not appropriate because he did not profit from his violations of the securities laws. This argument rests on a fundamental misunderstanding of the reason the district court ordered disgorgement. Bilzerian asserts that the district court found disgorgement appropriate because his misrepresentations suppressed the market price of the stock in question and he was therefore able to purchase stock at an artificially lower price; accordingly, he should disgorge the resulting profit. As Bilzerian sees it, the district court erred in ordering disgorgement because he did not purchase any stock after his alleged misrepresentations and so he could not have profited from any purchase price decrease caused by his misrepresentations.

But the district court found that Bilzerian's misrepresentations *inflated* the price he received from the *sale* of the securities. *See* App. of SEC at 1149–50. If Bilzerian had disclosed the truth about his stock purchases and source of funding, the market would have discounted his ability to take over the target corporations. By failing to make these disclosures, Bilzerian created the impression that hostile takeovers were imminent, thereby driving up the price of the

---

11. Moreover, Bilzerian ignores language elsewhere in the *Halper* opinion that a civil sanction is punitive if it "may not fairly be characterized as remedial, but *only* as deterrent or retribution." *Halper*, 490 U.S. at 449, 109 S.Ct. at 1902 (emphasis added). Under this definition, disgorgement is not a second punishment because it is not exacted solely for deterrence or retribution.

target corporations' securities. Accordingly, the district court ordered Bilzerian to disgorge the difference between the price he received for the sale of his shares—inflated artificially by his false filings with the SEC— and the price the shares would have brought were it not for his untimely and misleading filings. App. of SEC at 1149–50. Bilzerian's argument that he purchased no stock after making his misrepresentations is therefore irrelevant.

 Bilzerian also argues that the district court incorrectly calculated the amount of the disgorgement ($33,140,787.00). We will uphold the district court's disgorgement calculation unless it constitutes clear error. *SEC v. First City Fin.*, 890 F.2d 1215, 1228 (D.C.Cir.1989). We find that the district court's disgorgement order reasonably approximated Bilzerian's illicit profits. The court was careful to order disgorgement of the profits caused by Bilzerian's securities violations only. For the shares Bilzerian purchased after his securities violations occurred, the court subtracted Bilzerian's purchase price from the price at which he later sold the stocks based on the theory that all appreciation occurring after his violations was due to his illegal actions. For the shares purchased before his violations, the court subtracted from the sales price the market price on the first day of his violations, thereby ensuring that any pre-violation appreciation was not disgorged.

Calculations of this sort are often imprecise—it is impossible to say with certainty what portion of Bilzerian's profits is attributable to his securities violations. Bilzerian, however, bears the burden of establishing that the price increases that occurred during his ownership of the stocks were attributable to market forces rather than to his violations. *See First City Fin.*, 890 F.2d at 1232. He failed to carry his burden. Absent proof of this sort, the district court's calculation of the disgorgement amount was not clearly erroneous.

 Finally, Bilzerian argues that disgorgement was not proper because no one was injured by his fraudulent schemes. We disagree. Whether or not Bilzerian's securities violations injured others is irrelevant to the question whether disgorgement is appro-

priate. The primary purpose of disgorgement is not to refund others for losses suffered but rather "to deprive the wrongdoer of his ill-gotten gain." *SEC v. Blatt,* 583 F.2d at 1335. Moreover, others *were* injured by Bilzerian's deceptions—investors paid Bilzerian an inflated price for his stocks because of his illegal actions.

For the preceding reasons, the decisions of the district court are

*Affirmed.*