[No. B082486. Second Dist., Div. Seven. Sept. 21, 1995.]

THE PEOPLE, Plaintiff and Appellant, v.
$1,930 UNITED STATES CURRENCY, Defendant;
JOSE MARTINEZ TREJO, Claimant and Respondent.

**COUNSEL**

Gil Garcetti, District Attorney, Patrick D. Moran, Richard De La Sota and Dirk L. Hudson, Deputy District Attorneys, for Plaintiff and Appellant.

Michael P. Judge, Public Defender, Albert J. Menaster and Kathy Quant, Deputy Public Defenders, for Claimant and Respondent.

## OPINION

**WOODS (Fred), J.**—The People appeal from an order dismissing their action for civil forfeiture (in relation to controlled substances) on the basis that there was no current forfeiture law in effect. The People contend that there was a forfeiture law in effect at the time of the January 1994 dismissal. We agree and reverse with directions.

### FACTUAL AND PROCEDURAL SYNOPSIS

### I. *Background to The Superior Court Proceedings*

On September 27, 1993, claimant Jose Martinez Trejo was arrested and booked on charges of violating Health and Safety Code section[1] 11351 (possession of cocaine for sale.) As a result of that arrest, Trejo's property in the amount of $1,930 in United States currency was seized.

### II. *Superior Court Actions*

The People filed two separate actions relating to Trejo.

### A. *Criminal Action*

On October 28, 1993, the People executed a felony complaint (People v. Trejo (Super. Ct. Los Angeles County, 1993, No. BA-085582)), charging Trejo with various offenses committed on September 27, including possession of cocaine for sale, conspiracy to possess cocaine for sale and conspiracy to possess over $25,000 derived from controlled substance offenses. Various special allegations were added.

On September 16, 1994, Trejo pled guilty to one count of possession for sale, was sentenced to state prison for five years, and was ordered to pay fines in the amount of $350.

---

[1]Unless otherwise noted, all noncapitalized statutory references are to the Health and Safety Code. References to bill sections are to provisions in various legislative bills, identified by their authors.

### B. *The Civil Action*

On October 21, 1993, the People executed and served on Trejo a notice of administrative forfeiture in district attorney control No. AF-93-0698, alleging that the property seized on September 27, at three addresses, totaling $55,015 in United States currency, was seized for forfeiture pursuant to section 11470.

On October 29, in superior court No. BS025823 (based on No. AF-93-0698), Trejo filed a claim opposing forfeiture as to $1,930 in United States currency. On November 3, the People filed a complaint for forfeiture pursuant to section 11470 et seq.

On December 18, Trejo filed a notice of motion for return of property and dismissal of the forfeiture action on the ground that section 11470 no longer existed and thus could not be the basis for the forfeiture. Trejo also demurred to the complaint on the same ground.

The People filed opposition to the motion and the demurrer on the ground that "the law as it existed on December 31, 1988 governs all narcotics asset forfeiture cases initiated or pending as of January 1, 1994."

After a hearing on January 20, 1994, the superior court concluded that there was no current forfeiture statute in effect and granted the motions for return of the property and dismissal of the forfeiture action and sustained the demurrer on the ground that the 1993 forfeiture law expired on January 1, 1994, and the 1988 forfeiture statute was repealed by its own terms. The court later amended its order to include a dismissal of this case.

The People filed a timely notice of appeal.[2]

DISCUSSION

### I. *Legislative Background*

#### A. *General History of the Forfeiture Law*

The present law for the forfeiture of assets in relation to controlled substances (§ 11470) had its genesis in 1972 with the passage of the Uniform Controlled Substances Act. (Stats. 1972, ch. 1407, p. 2986.) The forfeiture of

---

[2]According to the People, this court subsequently denied their petition for a writ of mandate, and the California Supreme Court denied their petition for review.

certain equipment and containers was authorized upon a criminal conviction being obtained.

Senate Bill No. 2095, 1975-1976 Regular Session (Stats. 1976, ch. 1407, p. 6331) authorized the forfeiture of conveyances used to facilitate drug trafficking upon a criminal conviction. This bill also introduced the first procedural provisions for a separate forfeiture hearing, as well as the first innocent owner defense.

Senate Bill No. 518, 1981-1982 Regular Session (Stats. 1982, ch. 1280, p. 4731) authorized the forfeiture of the profits of drug dealing and established more detailed provisions for seizures and subsequent forfeiture proceedings. A criminal conviction was still required for forfeiture, and the burden of proof was beyond a reasonable doubt that the property was subject to forfeiture.

Senate Bill No. 1462, 1985-1986 Regular Session (Stats. 1986, ch. 534, p. 1911) authorized the forfeiture of real property in certain limited circumstances.

Assembly Bill No. 4145, 1985-1986 (Stats. 1986, ch. 1032, p. 3576) eliminated the conviction requirement in cases involving more than $25,000 and established a clear and convincing evidence burden of proof in those cases. It maintained the conviction requirement and the requirement of proof beyond a reasonable doubt in cases involving less than that amount. It also established a procedure whereby amounts up to $25,000 could be administratively forfeited.

Assembly Bill No. 4162, 1987-1988 (Stats. 1988, ch. 1492, p. 5285) established the version of the law which expired as of January 1, 1994. It eliminated the conviction requirement altogether and established the preponderance of the evidence standard as the burden of proof in all forfeiture proceedings. It allowed for the administrative forfeiture of personal property valued at up to $100,000, narrowed the innocent owner provisions, and increased the share of the forfeiture distribution going to the seizing agency.

Assembly Bill No. 1450, 1989-1990 (Stats. 1989, ch. 1195, p. 4600) authorized the forfeiture of firearms and Alchoholic Beverage Control licenses.

Assembly Bill No. 4251, 1989-1990 (Stats. 1990, ch. 1200, p. 5004) explicitly made the provisions of the Code of Civil Procedure applicable to forfeiture proceedings and authorized the interlocutory sale of assets sought to be forfeited.

Thus, the statutes gradually separated the forfeiture proceedings from the underlying or related criminal case. The impetus for this separation was the

existence of a federal statute that allowed for the forfeiture of assets in a wider variety of situations within a more practical procedural framework. (See *Mundy* v. *Superior Court* (1995) 31 Cal.App.4th 1396, 1401 [37 Cal.Rptr.2d 568].) The result was Assembly Bill No. 4162, 1989-1990 Regular Session, which was passed on a five-year experimental basis. At the end of the experimental period, on January 1, 1994, experimental versions of various Health and Safety Code sections expired by their own terms.

## B. *Sunset-Sunrise Provisions*

### 1. *The Condit Law*[3]

Condit was enacted in 1987, Assembly Bill No. 1076, 1987-1988 Regular Session. Condit had two alternative versions for each essential Health and Safety Code section constituting the forfeiture law. One set of sections was in effect until January 1, 1989, with the second set being in suspension, i.e., to become effective on January 1, 1989. (See Stats. 1987, ch. 924, p. 3109.)

Condit added sunset clauses to sections 11470, 11473.3, 11488, 11488.4 and 11488.5. These clauses provided that: "This section shall remain in effect only until January 1, 1989, and as of that date is repealed, unless a later enacted statute, which is enacted before January 1, 1989, deletes or extends that date." (Stats. 1987, ch. 924, §§ 1, 2, 3, 4, 6, pp. 3111-3112, 3113, 3116-3117, 3120.) It also added sunrise provisions to other portions of sections 11488.4 and 11488.5. Those provisions stated that: "This section shall become operative on January 1, 1989." (Stats. 1987, ch. 924, §§ 5, 7, pp. 3118, 3121.)

The Legislature had previously followed the same pattern in this area by placing the prior law in suspension for the period the innovation was to be effective. (See, e.g., Stats. 1986, ch. 1032, §§ 1, 2, 4, 5, 6, 8, 9, pp. 3576 et seq., 3582 et seq., 3585 et seq., Stats. 1986, ch. 1044, §§ 25.5, 25.7, 26.5, 26.7, pp. 3647, 3649, 3651.)[4]

---

[3]Various versions of the forfeiture law are referred to by the author's name. (See *Mundy* v. *Superior Court, supra*, 31 Cal.App.4th 1396, 1400.)

[4]The previous law had added a sunset clause to one version of section 11470. This clause provided: "This section shall remain in effect only until January 1, 1989, and as of that date is repealed, unless a later enacted statute, which is enacted before January 1, 1989, deletes or extends that date. If that date is not deleted or extended, then, on and after January 1, 1989, pursuant to Section 9611 of the Government Code, Section 11470 of the Government Code, as amended by Section 2 of Chapter 534 of the Statutes of 1986 [SB 1462], shall have the same force and effect as if this temporary provision had not been enacted." (Stats. 1986, ch. 1032, § 1, p. 3576.) Another version of section 11470 contained a sunrise clause which provided:

## 2. *The Katz Law*

At the time of the decision in this case, the forfeiture law that had been in effect for the past five years had been enacted in 1988 as Assembly Bill No. 4162, 1987-1988 Regular Session, Katz, which had become effective on January 1, 1989. (See Stats. 1988, ch. 1492, p. 5285.)

Katz amended the existing forfeiture provisions of Condit and repealed the provisions which were in suspension during 1988.[5] The Legislature followed its familiar pattern and, in section 16 of Katz, made Condit re-effective on January 1, 1994, by providing: "The provisions of the Health and Safety Code amended by this act shall remain in effect only until January 1, 1994, at which time those sections as they read on December 31, 1988, shall have the same force and effect as if they had not been amended." (Stats. 1988, ch. 1492, § 16, p. 5298.)

There were three relevant subsequent amendments to Katz. In 1989, Health and Safety Code sections amended by Katz were again amended, but there were no sunset or sunrise provisions in the chaptered bill. (See Stats. 1989, ch. 1195, p. 4600.) In 1990, sections 11470, 11488.4, 11488.5 and 11488.6, as amended by the 1989 act, were amended a second time, this time inserting an explicit sunset clause into each of those sections. Those sections, as they read on December 31, 1993, contained the following language: "This section shall remain in effect only until January 1, 1994, and as of that date is repealed." (Stats. 1990, ch. 1200, § 1, 4, 5, & 6, pp. 5004, 5006-5011.)

The third amendment came in 1991. Section 14 of Assembly Bill No. 192, 1991-1922 Regular Session, explicitly amended section 16 of Katz, exempting section 11489 from the sunset/sunrise provisions of Katz. Thus, in 1991, the Legislature was still treating section 16 of Katz as the operative sunset/sunrise provision for the forfeiture statutes. Later amendments to section 11489 contained their own sunset/sunrise provisions. (See Stats. 1992, chs. 473, 722.)

The Legislature failed to act before December 31, 1993, to extend or lift the sunset provisions of Katz or any of the provisions within each code section.

---

"This section shall become operative January 1, 1989, unless the act enacting this section or a later enacted statute provides otherwise." (Stats. 1986, ch. 1032, § 3, p. 3582.) Similar clauses were added to counterpart versions of section 11488. (Stats. 1986, ch. 1032, §§ 5, 7, pp. 3583, 3584.)

[5]See, e.g., Section 1 of Katz amended section 11470 as it existed in 1988, and Section 2 of Katz repealed the version of section 11470 then in suspension. (Stats. 1988, ch. 1492, p. 5285.)

### C. *The Burton Law*

On August 19, 1994, the Governor approved Assembly Bill No. 114, 1993-1994 Regular Session, Burton, to take effect immediately as an urgency statute. (Stats. 1994, ch. 314, § 26.) Burton enacted a new drug asset forfeiture law and eliminated all sunset provisions from the statutory scheme. (Stats. 1994, ch. 314, §§ 2, 7, 8, 11, 12, 14 & 14.5, respectively repealing sections 11470, 11473.3, 11488, 11488.4 and 11488.5.) Burton also clarified the status of asset forfeiture cases which had been pending following the self-repeal of certain statutes on January 1, 1994. (Stats. 1994, ch. 314, § 22.)

Section 22 of Burton added section 11494, which provides: "In the case of any property seized or forfeiture proceeding initiated before January 1, 1994, the proceeding to forfeit the property and the distribution of any forfeited property shall be subject to the provisions of this chapter in effect on December 31, 1993, as if those sections had not been repealed, replaced, or amended."

## II. *Trial Court's Ruling*

The hearing on Trejo's motion to dismiss was held on January 20, 1994. Katz, which had been in effect from 1989 to 1993, provided: "The provisions of the Health and Safety Code amended by this act shall remain in effect only until January 1, 1994, at which time those sections as they read on December 31, 1988, shall have the same force and effect as if they had not been amended."

Condit, which was in effect on December 31, 1993, provided: "This section shall remain in effect only until January 1, 1989, and as of that date is repealed, unless a later enacted statute, which is enacted before January 1, 1989, deletes or extends that date."

Looking to these two provisions, the court noted that Katz called for the revival of the sections as they read on December 31, 1988, (i.e., Condit) and reasoned that upon revival, Condit had been repealed as it contained a repealer section stating that it would expire on January 1, 1989. The court concluded that as Katz and Condit had both expired, there was no forfeiture statute in effect at that time.

## III. *Principles of Statutory Construction*

■ "The fundamental rule of statutory interpretation is to ' "ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' "

[Citation.] In determining intent, the court looks first to the words themselves. [Citation.] 'When the language is clear and unambiguous, there is no need for construction.' [Citation.] The court will decline to follow the plain meaning of a statute only when to do so would inevitably frustrate the manifest purposes of the legislation as a whole or lead to absurd results." (*In re Ge M.* (1991) 226 Cal.App.3d 1519, 1522-1523 [277 Cal.Rptr. 554].)

" 'But "[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." [Citations.] Thus "[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." [Citation.]' " (*Whitman* v. *Superior Court* (1991) 54 Cal.3d 1063, 1072 [2 Cal.Rptr.2d 160, 820 P.2d 262].)

Other rules of statutory construction are: "(1) Ascertain the intent of the Legislature so as to effectuate the purpose of the law. (2) Give a provision a reasonable and common sense interpretation consistent with the apparent purpose, which will result in wise policy rather than mischief or absurdity. (3) Give significance, if possible, to every word or part, and harmonize the parts by considering a particular clause or section in the context of the whole. (4) Take into account matters such as context, object in view, evils to be remedied, legislation on the same subject, public policy, and contemporaneous construction. (5) Give great weight to consistent administrative construction." (7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 94, pp. 146-147.) Legislative history is also an important aid in interpretation. (*Id.*, at § 97, p. 150.)

In addition, it cannot be presumed that the Legislature indulged in idle acts. (*Stafford* v. *Realty Bond Service Corp.* (1952) 39 Cal.2d 797, 805 [249 P.2d 241].)

IV. *Effective Forfeiture Law*

■ Most of Trejo's arguments regarding the expiration of Condit were raised in *People* v. *One 1986 Toyota Pickup* (1995) 31 Cal.App.4th 254, 260-262 [37 Cal.Rptr.2d 29]. In concluding that Condit had been revived as of January 1, 1994, the court reasoned:

"The ultimate interpretation of a statute is an exercise of the judicial power, a power conferred upon the courts by the Constitution. [Citation.]

The primary rule of statutory construction to which every other rule must yield is that the intention of the Legislature should be given effect. The language of any statute and provision therein may not be construed so as to nullify the will of the Legislature or to cause the law to conflict with the apparent purpose the lawmakers had in view. [Citation.]

"Legislative intent should be gathered from the whole act rather than from isolated parts or words. The object sought to be achieved by the statute and the evil sought to be prevented are of prime consideration in its interpretation. Where the main purpose of the statute is expressed, the courts will construe it so as to effectuate that purpose by reading into it what is necessary or incident to the accomplishment of the object sought. [Citation.] Claimant fails to explain away the absurdity which looms in the instant case—that the Legislature apparently brought back the 1988 law on January 1, 1994, only to have it instantly repealed by its own terms as of December 31, 1988. Moreover, repeal of a statute can be effected only by language of unmistakable meaning." (31 Cal.App.4th at pp. 263-264.)

Accordingly, at the time of the instant dismissal, Condit was the version of the forfeiture law which was in effect. However, afterwards, the Legislature enacted Burton, which provided: "In the case of any property seized or forfeiture proceeding initiated before January 1, 1994, the proceeding to forfeit the property and the distribution of any forfeited property shall be subject to the provisions of this chapter in effect on December 31, 1993, as if those sections had not been repealed, replaced, or amended."

A. *Ex Post Facto*

Trejo argues that Burton has no effect on any case which predates its enactment, i.e., it did not revive Katz, and that any attempt to apply Katz to this case would violate ex post facto prohibitions. These issues were addressed in *Mundy* v. *Superior Court, supra,* 31 Cal.App.4th 1396, 1402-1403, in which the court determined that the Legislature intended to revert to an earlier version (i.e., Katz) of the forfeiture law. The court noted: "We therefore find the forfeiture provisions attacked by Mundy did not suddenly disappear on January 1, 1994. Instead, the *Condit* provisions became effective that day and remained enforceable until August 19, 1994, when the new forfeiture law became effective. Under the new law, the statutes in effect on December 31, 1993 (*Katz*) govern proceedings which were commenced before January 1, 1994. We therefore must determine whether subjecting

Mundy to *Katz* instead of *Condit* constitutes a deprivation of his constitutional rights." (*Id* . at p. 1405.) Like Mundy, Trejo is subject to *Katz.*

In *Mundy*, the claimant had argued that because Katz offered fewer procedural safeguards than *Condit*, its resurrection violated the ex post facto prohibitions. (See U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9.) The court reasoned that: "Mundy's property was subject to forfeiture under both *Condit* and *Katz*. Mundy's complaint is therefore limited to the procedural mechanisms governing his forfeiture action. ■ When a change in the law addresses the conduct of trials which have yet to occur, as opposed to past conduct, the law is deemed prospective only and does not implicate ex post facto concerns." (*Mundy* v. *Superior Court, supra*, 31 Cal.App.4th at p. 1406.)

■ The court concluded: "In this case, Mundy is being subjected to the exact same statutes [Katz] which were in effect at the time his property was seized and forfeiture proceedings began. He cannot claim unfair surprise or vindictive government action under these circumstances." (*Mundy* v. *Superior Court, supra*, 31 Cal.App.4th at p. 1406; see also discussion as to why ex post facto prohibition does not apply to Katz civil forfeiture proceedings in *People* v. *25651 Minoa Dr.* (1992) 2 Cal.App.4th 787, 795-797 [3 Cal.Rptr.2d 577].)

Under *One Toyota* and *Mundy*, we conclude that pursuant to Burton, Trejo is subject to the provisions of the Katz law and that the application of Katz does not violate ex post facto provisions. Thus, the only question left is whether the double jeopardy provisions prohibit the People from pursuing the civil forfeiture action.

### B. *Double Jeopardy*

■ The Fifth Amendment of the United States Constitution and article I, section 15 of the California Constitution protect against multiple punishment for the same offense. Trejo contends that double jeopardy prohibits punishment in a separate postconviction proceeding, i.e., the People cannot pursue the civil forfeiture action because he has already been convicted and sentenced on the criminal offense.[6]

■ There are two prongs to the double jeopardy analysis— (1) a prohibition against multiple punishment for the same offense, and (2) a prohibition against a second prosecution for the same offense. (*United States* v.

---

[6]Double jeopardy is a defense which is ordinarily raised by a special plea, and the failure to set up the special plea or to offer evidence in support of it is a waiver. (1 Witkin & Epstein,

*Halper* (1989) 490 U.S. 435, 440 [104 L.Ed.2d 487, 496, 109 S.Ct. 1892]; *U.S.* v. *Saccoccia* (9th Cir. 1994) 18 F.3d 795, 798-799.)

 Prior to *Halper*, the United States Supreme Court had recognized that separate civil and criminal proceedings comported with double jeopardy. (See, e.g., *United States* v. *One Assortment of 89 Firearms* (1984) 465 U.S. 354, 362-366 [79 L.Ed.2d 361, 368-371, 104 S.Ct. 1099] ["We . . . conclude that the forfeiture mechanism set forth in [18 U.S.C.] § 924(d) is not an additional penalty for the commission of a criminal act, but rather is a separate civil sanction, remedial in nature."]; *One Lot Emerald Cut Stones* v. *United States* (1972) 409 U.S. 232, 235 [34 L.Ed.2d 438, 442, 93 S.Ct. 489] ["If for no other reason, the forfeiture is not barred by the Double Jeopardy Clause of the Fifth Amendment because it involves neither two criminal trials nor two criminal punishments."].)[7]

*United States* v. *Halper, supra,* 490 U.S. 435, 446 [104 L.Ed.2d 487, 500], addressed the issue of whether and under what circumstances a civil penalty might constitute punishment for the purposes of the double jeopardy clause. The court stated: "The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law, and for the purposes of assessing whether a given sanction constitutes multiple punishment barred by the Double Jeopardy Clause, we must follow the notion where it leads." (*Id.,* at pp. 447-448 [104 L.Ed.2d at pp. 501-502].)

In *Halper,* a case involving the federal criminal false claims statute and a separate civil action, the court held that a civil penalty may be punishment for double jeopardy purposes if the penalty was not rationally related to the goal of making the government whole. (490 U.S. at p. 451 [104 L.Ed.2d at pp. 503-504].) The court noted that ". . . the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve." (*Id.,* at p. 448 [104 L.Ed.2d at p. 501].) The court reasoned that ". . . a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving

Cal. Criminal Law (2d ed. 1988) § 337, pp. 391-392.) However, in the instant case, Trejo's criminal conviction was entered after this civil forfeiture action was dismissed so that Trejo did not have the opportunity to raise the defense in the trial court. Accordingly, we will treat his raising it on appeal as equivalent to asserting the defense in the trial court.

[7]In *United States* v. *Halper, supra,* 490 U.S. at page 446 [104 L.Ed.2d at page 500] and *Austin* v. *United States* (1993) __ U.S. __, __, footnote 4 [125 L.Ed.2d 488, 495-497, 113 S.Ct. 2801, 2804-2805], the United States Supreme Court cited these two cases without overturning or disapproving them.

either retributive or deterrent purposes, is punishment, as we have come to understand the term." (*Ibid.*)

The court held that "under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." (490 U.S. at pp. 448-449 [104 L.Ed.2d at pp. 501-502].) The court clarified: "[T]he only proscription established by our ruling is that the Government may not criminally prosecute a defendant, impose a criminal penalty upon him, and then bring a separate civil action based on the same conduct and receive a judgment that is not rationally related to the goal of making the Government whole." (*Id.*, at p. 451 [104 L.Ed.2d at pp. 503-504].) The court stated that its holding did not prevent the government from seeking both the full civil penalty and the full range of statutorily authorized criminal penalties in the same proceeding. (*Id.*, at p. 450 [104 L.Ed.2d at pp. 502-503].)

Trejo argues that under *Austin* v. *United States*, *supra*, __ U.S. at pp. __-__ [125 L.Ed.2d at pp. 504-506, 113 S.Ct. 2801 at pp. 2811-2812], actions like this civil forfeiture action are punishment for double jeopardy purposes. However, in *Austin*, the government had initiated civil forfeiture proceedings against a body shop and mobile home after the owner had pled guilty to a drug offense. The provisions (21 U.S.C. § 881(a)(4), (7)) which the court found to constitute punishment in *Austin* allowed for the forfeiture of conveyances (e.g., aircraft, vehicles, vessels) and real property. The court noted that double jeopardy had been held not to apply to civil forfeiture proceedings in cases where the forfeiture could be characterized as remedial. (__ U.S. at pp. __-__, fn. 4 [125 L.Ed.2d at pp. 495-497, 113 S.Ct. at pp. 2804-2805].) The court merely held that a civil fine may violate the prohibition against excessive fines of the Eighth Amendment to the United States Constitution, not that all forfeitures were punishment for excessive fines purposes. (*Id.*, at p. __, fn. 14 [125 L.Ed.2d at p. 505, at p. 2812].)

Citing *U.S.* v. *$405,089.23 U.S. Currency* (9th Cir. 1994) 33 F.3d 1210, 1218, Trejo further argues that the Ninth Circuit has determined that drug forfeiture cases are considered punishment and that double jeopardy bars any subsequent forfeiture proceeding. In *$405,089.23*, the court reasoned that the same definition of punishment used in *Austin* for excessive fines under the Eighth Amendment should apply for double jeopardy purposes under the Fifth Amendment and that separate proceedings are thus barred by double jeopardy. (*Id.*, at pp. 1219, 1222.) The court looked to the entire forfeiture

statute and concluded that the forfeiture was punishment because the statute did not serve a solely remedial purpose. (*Id.*, at pp. 1220-1222.)

We recognize that California's drug forfeiture statutes serve both remedial and punitive purposes. (See § 11469, subds. (a) & (j).) We also recognize that language in *Halper* suggests that the test is whether a sanction imposed by a statute is solely remedial, but we also note that other language in *Halper* refers to the rational relation test. Accordingly, we are persuaded by other decisions which have not interpreted *Halper* so narrowly to mean that unless a statute serves solely a remedial purpose, it constitutes punishment for double jeopardy purposes.

In *U.S.* v. *Tilley* (5th Cir. 1994) 18 F.3d 295, the court analyzed whether a prior civil forfeiture of proceeds (consisting of cash and other personal property with a total value of approximately $650,000) from drug sales barred subsequent criminal prosecution for the illegal sale of drugs under the double jeopardy clause. The court noted that *Halper*'s analytic methodology "focuses on the relationship between the amount of the civil sanction and the amount required to serve the remedial purpose of reimbursing the costs incurred by the government and society as a result of the wrongful conduct. We should make clear, however, that the sanction in *Halper* did not involve the proceeds from the crimes charged and the fact that the property forfeited in today's case constitutes unlawful proceeds is crucial to our analysis." (*Id.*, at p. 298.)

The court concluded that the fine imposed in that case was "not so excessive as to render the relationship between the amount of the forfeiture and the resulting costs to government and society irrational." (*U.S.* v. *Tilley*, *supra*, 18 F.3d at p. 299.) The court reasoned: "The forfeiture of proceeds of illegal drug sales serves the wholly remedial purposes of reimbursing the goverment for the costs of detection, investigation, and prosecution of drug traffickers and reimbursing society for the costs of combatting the allure of illegal drugs, caring for the victims of the criminal trade when preventative efforts prove unsuccessful, lost productivity, etc." (*Ibid.*)

The court noted: "Although revenue from illegal drug sales and the cost to the government and society are incapable of exact measurement, a principal recognized in [*Halper*], the amount of illicit drug proceeds confiscated in this case [does] not appear to be excessive in comparison to the resulting governmental and societal costs. Various sources estimate that illegal drug sales produce approximately $80 to $100 billion per year while exacting $60

to $120 billion per year in costs to the goverment and society. . . . Clearly, the above overlapping estimates of proceeds and [the] resulting costs are not 'overwhelmingly disproportionate' on a national level and, we believe, indicate a rough proportionality between the $650,000 sanction and the resulting governmental and societal costs in this case. . . . [¶] Further, in this case, the defendants only forfeited a portion of the total proceeds that their large-scale drug operation produced over several years, i.e., the proceeds on hand at the time of seizure. The amount of the forfeiture bears a direct relation to the specific drug sales that generated those proceeds, but fails to compensate fully for the wrongs done from all the drug sales. Thus, instead of roughly approximating the resulting governmental and societal costs, the instant forfeiture failed to compensate fully for the wrongs done." (*U.S.* v. *Tilley, supra,* 18 F.3d at p. 299.)

*Tilley* also distinguished *Austin*, noting: "[T]he forfeitures of conveyances and real estate have no correlation to, or proportionality with, the costs incurred by the government and society because of the large and unpredictable variance in the values of real estate and conveyances in comparison to the harm inflicted upon government and society by the criminal act. Unlike the real estate forfeiture statute that can result in the confiscation of the most modest mobile home or the stateliest mansion, the forfeiture of drug proceeds will always be directly proportional to the amount of drugs sold. The more drugs sold, the more proceeds that will be forfeited. As we have held, these proceeds are roughly proportional to the harm inflicted upon government and society by the drug sale. Thus, the logic of *Austin* is inapplicable to . . . the forfeiture of drug proceeds." (*U.S.* v. *Tilley, supra,* 18 F.3d at p. 300.)

Moreover, other federal courts have found that Fifth and Eighth Amendment protections did not apply to civil forfeiture proceedings. (Cf. *U.S.* v. *U.S. Currency* (2d Cir. 1994) 18 F.3d 73, 74-76 [forfeiture of laundered funds is wholly remedial]; cf. *S.E.C.* v. *Bilzerian* (D.C. Cir. 1994) 29 F.3d 689, 696 [308 App.D.C. 43] [order requiring convicted defendant to disgorge profits of illegal securities trading did not constitute additional punishment barred by double jeopardy]; cf. *U.S.* v. *Alexander* (8th Cir. 1994) 32 F.3d 1231, 1236 ["Forfeiture of proceeds cannot be considered punishment, and thus, subject to the excessive fines clause, as it simply parts the owner from the fruits of the criminal activity."]; *U.S.* v. *Cullen* (4th Cir. 1992) 979 F.2d 992, 994-995 and *U.S.* v. *Borromeo* (4th Cir. 1993) 1 F.3d 219, 221 [both rejecting claims that civil forfeiture actions rise to the level of a criminal punishment, thereby triggering the double jeopardy clause; but the latter, which was decided after *Austin*, was remanded to the district court to

consider the proportionate value of the proceeds with the harm occasioned by the criminal conduct.];[8] *In re Moffitt, Zwerling & Kemler, P.C.* (E.D.Va. 1994) 846 F.Supp. 463, 476 [Eighth Amendment and *Austin* do not apply to forfeitures of drug trafficking proceeds because they cannot be excessive]; *U.S.* v. *$288,930.00 in U.S. Currency* (N.D.Ill. 1993) 838 F.Supp. 367, 370-371 [*Austin* does not apply to drug proceeds forfeitures]; *U.S.* v. *Haywood* (W.D.N.C. 1994) 864 F.Supp. 502, 508-509 [forfeiture of drug proceeds which were furnished/intended to be furnished in exchange for controlled substances is not punitive and does not trigger the double jeopardy clause].)

Earlier this year, in a case involving the forfeiture of gambling proceeds, a New York court observed: "After *Halper/Austin*, a majority of courts have held that separate forfeiture proceedings of contraband per se, the res of a crime, or the proceeds of a crime are constitutional under the Double Jeopardy-Eighth Amendment clauses [citations]. [¶] A minority of courts have found Double Jeopardy/Excessive Fine violations for proceeds of crimes or contraband per se . . . ." (*District Atty. of Kings County* v. *Iadarola* (1995) 164 Misc.2d 204 [623 N.Y.S.2d 999, 1004] and cases cited therein, fns. omitted.) The court held that ". . . the Double Jeopardy clause is inapplicable to the res of a crime, contraband per se, or the proceeds of a crime." (*Id.*, at p. 1005.) Generally, we agree with the majority.

In *Halper*, in determining that a civil penalty of $130,000 for a $585 gain (from filing false claims) was a punishment, the court observed that it was a rare case because the penalty was so overwhelmingly disproportionate that it did not meet the rational relation test and thus could only be characterized as deterrence or retribution. (*United States* v. *Halper, supra*, 490 U.S. at p. 449 [104 L.Ed.2d at p. 502].) The court reasoned that as long as there is a rational relation to the goal of making the government whole, the government can demand compensation, even with an imprecise formula, without having the penalty being deemed to have imposed a second punishment as the sanction constitutes reasonable liquidated damages. (*Ibid.*) The court did not decide that no sanction could be imposed; rather, it remanded the matter to the trial court to determine what civil sanction the government might receive. (*Id.*, at p. 450 [104 L.Ed.2d at pp. 502-503].)

Trejo argues that the People cannot prove the amount involved here was rationally related to actual loss. Because of the procedural stance of this

---

[8]The court later decided that a three-part instrumentality test should be applied to determine if a fine was excessive. (*U.S.* v. *Chandler* (4th Cir. 1994) 36 F.3d 358, 365.)

case, the People did not have the opportunity to provide such proof. Accordingly, we will remand the cause to the trial court with directions for it to determine whether a rational relation exists between the penalty imposed (i.e. the forfeiture) and the remedial purposes of the statute.

Thus, whether double jeopardy bars the prosecution of this civil forfeiture action depends upon whether or not the trial court finds that there is a rational relation between the proportionate value of the proceeds and the harm occasioned by the criminal conduct.

### DISPOSITION

The judgment is reversed and the cause remanded with directions to the superior court to vacate its orders granting the motions for the return of property, sustaining the demurrer and dismissing the forfeiture action and to hold further proceedings in accordance with the views expressed herein. Appellant to recover costs on appeal.

Lillie, P. J., concurred.

**JOHNSON, J.**—I concur in the judgment but write separately to register my views as to what the trial court must determine at its hearing on remand. I agree with the Ninth Circuit cases cited but disapproved in the majority opinion, in particular *U.S.* v. *$405,089.23 U.S. Currency* (9th Cir. 1994) 33 F.3d 1210. Those opinions require the prosecution to prove the forfeiture it seeks will serve solely remedial purposes. To the extent the forfeiture exceeds the amount justified as remedial, the *excess* amount constitutes punishment. As such, it is governed by principles of double jeopardy and cannot be collected if the defendant already has suffered a criminal penalty for the same offense. (*United States* v. *Halper* (1989) 490 U.S. 435, 448-449 [104 L.Ed.2d 487, 501-502, 109 S.Ct. 1892] [". . . a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction *to the extent that the second sanction may not fairly be characterized as remedial,* but only as a deterrent or retribution."].) To avoid double jeopardy, a trial court could and would have to reduce the forfeiture to an amount reasonably related to a solely remedial purpose.

Accordingly, in my view the trial court on remand must determine whether the People can justify forfeiture of any or all of the $1,930 at issue on grounds it merely compensates the government for its loss in this

particular case. In making this assessment, the court also must take account of any other money or property the government already may have recovered from respondent. Those other assets also would be available for this same compensatory purpose. Thus the court should deduct their value from the amount required to compensate the government for its losses. Should the trial court determine some or all of the $1,930 (as an addition to any other forfeited assets) exceeds the amount rationally related to the goal of compensating the government's loss, double jeopardy principles require the court to deny recovery of that excess.

A petition for a rehearing was denied October 23, 1995, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied January 4, 1996.