**UNITED STATES of America, Plaintiff,**

v.

**J. Marshall HAYWOOD, Defendant.**

No. 3:92–cv–229–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Oct. 3, 1994.

James M. Sullivan, U.S. Attorney's Office, Charlotte, NC, for plaintiff.

John R. Cunningham, III, E. Fitzgerald Parnell, Charlotte, NC, for defendant.

## MEMORANDUM OF DECISION and ORDER

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on Defendant J. Marshall Haywood's (hereinafter "Haywood") motion, filed December 10, 1993, for Summary Judgment. Plaintiff, United States of America (hereinafter "the Government") filed a response to Defendant's Motion for Summary Judgment on December 30, 1993. On February 11, 1994, the Government filed a cross Motion for Summary Judgment. Defendant filed a reply to the Government's response on February 23, 1994 and a Memorandum in Opposition to the Government's Motion for Summary Judgment on February 25, 1994. Defendant also filed a series of motions on February 14, 1994, principally regarding a pending motion to dismiss and subsequent discovery in this case.[1]

On May 9, 1994, following the extended discovery period, Defendant filed a Supplemental Memorandum in Support of their Motion for Summary Judgment and in Opposition to the Government's Motion for Summary Judgment. On May 23, 1994, the Government filed its Supplemental Memorandum in Support of their Motion for Summary Judgment and in Opposition to the Defendant's Motion for Summary Judgment. That same day Defendant filed an additional Memorandum relating to the deposition of W. Dennis Purser.[2] The Government filed a Reply to the Defendant's Memorandum on May 27, 1994.

The Court has reviewed the motions for summary judgment and the briefs in support of them, each parties' responses and additional memoranda, and the relevant legal authorities. Based upon its review of this case, the Court makes the following findings of facts and conclusions of law.

## FACTUAL BACKGROUND

On June 18, 1992, the Government filed the Complaint in this action against the defendant for a civil penalty pursuant to Title 18 U.S.C. § 1956(b), a money laundering statute. The Government seeks this penalty against Haywood based on his involvement in

---

**1.** On September 23, 1992 this matter was stayed pending the conclusion of the criminal proceedings in South Carolina. On October 7, 1993 the stay was lifted and a new discovery deadline of April 25, 1994 was imposed. As a result of this discovery extension, counsel was permitted to supplement their respective summary judgment motions by May 9, 1994. *See United States v.* *Haywood,* Case No. 3:92CV229–P, Order of March 25, 1994.

**2.** The Court extended the discovery deadline to May 25, 1994 in order for the deposition of Mr. Purser, previously unavailable, to take place.

arranging bail for one Charles Roy Langley in 1987.

Subsequent to the filing of the present civil action, a Grand Jury in the United States District of South Carolina returned a Bill of Indictment against the defendant charging him with violations of Title 18 U.S.C. §§ 2, 371 and 1956 and Title 21 U.S.C. § 846. On December 21, 1992, the defendant entered into a plea agreement with the United States in which he agreed to plead guilty to a Bill of Information charging him with failure to file a required report for a cash transaction, a violation under Title 26 U.S.C. §§ 6050I and 7203, as well as a violation of Title 18 U.S.C. § 2. *See* Haywood Aff. ¶ 5–7 and Ex. C–E. The plea agreement was filed, a sentencing hearing held, and final judgment was entered on September 29, 1993.[3]

As noted above, at the heart of the Complaint is the allegation that Haywood played a role in arranging a financial transaction involving the payment of a $280,000 bond and the return of a portion of that bond in June and October 1987. Specifically, the Government alleges that attorney Haywood and Dennis Purser, head of a drug organization along with John Arrendell, participated in a scheme to pay the bond of Roy Langley, a member of the Arrendell–Purser drug organization, with drug trafficking proceeds in order to prevent Langley from cooperating with the Government.

The Government further alleges that a planned covert exchange of drug cash took place at a bank office located below Haywood's law offices. According to the Government, this exchange was planned and coordinated between Haywood, Purser, possibly Arrendell, and Haywood's associate Bart Menser. The Government's version of the exchange is essentially as follows: Under Haywood's direction, Dennis Purser would give the money to his brother, Donald Purser, who would in turn deliver it to the bondsman at the bank after receiving a signal (the flashing of window blinds) from Menser who was positioned at a window in Haywood's

office. This scheme was successfully accomplished, the bond was paid and Langley was released. Soon thereafter Langley became a fugitive and was later returned to custody at which time Haywood arranged to have the remaining bond money, less fees, returned to Purser.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides,

> ... judgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) (West 1994).

Summary judgment must be granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id., Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir.1984). To attain summary judgment, the movant bears an initial burden of demonstrating no genuine issues of material fact are present. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party who must point out specific facts which create disputed factual issues. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In evaluating a summary judgment motion, district courts must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962). Those facts which the moving party bears the burden of proving are facts which are material. "[T]he substantive law will identify which facts are

---

**3.** The United States District Court for South Carolina entered an amended judgment on October 28, 1993 which imposed a sentence of one year which was to be suspended after the service of 6 months active incarceration, a fine of $20,000 and a two year term of probation. Defendant was also required to agree to at least a two year suspension from the practice of law. *See U.S. v. J. Marshall Haywood,* Criminal No. 0:92–432–6 (Rock Hill Div., D.S.C.)

material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

An issue of material fact is genuine when, "the evidence ... create[s] [a] fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds could recognize as real factual disputes." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence from the entire record could not lead a rational fact finder to rule for the non-moving party. *Matsushita Electric Industrial Co.,* 475 U.S. at 587, 106 S.Ct. at 1356, *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53 (1986).

### ANALYSIS

Properly used, summary judgment helps strip away the underbrush and lay bare the heart of the controversy between the parties. In this case there are essentially two issues which need to be analyzed in order to determine whether summary judgment is appropriate. The first issue involves Defendant's claims that this action is barred under Double Jeopardy principles and the other issue essentially involves the scienter element required under 18 U.S.C. § 1956(b). For the reasons stated *infra,* the Court believes there are no genuine material issues of material fact regarding the Double Jeopardy claim and such claim is without merit and must be denied.

The second issue concerning the scienter element under the statute is more problematic. Having spent considerable time probing the pleadings and assessing the proof in order to see whether there is a genuine need for trial, the Court concludes that a proper determination of Defendant's state of mind in this case, which is necessarily proved by inference from evidence of other facts, requires the resolution of disputes over the inferences to be drawn from the facts of this case. Such disputes concerning genuine and material facts and inferences clearly involves the kinds of decisions traditionally entrusted to jurors and certainly lies within their province, thus precluding summary judgment in this case.

### 1. Double Jeopardy

The Double Jeopardy Clause of the Fifth Amendment provides: "nor shall any person be subject for the same offence to be twice put in jeopardy of life and limb." U.S. Const. amend V. This Court is of the opinion that these words, as first put forth by the framers of the Fifth Amendment, did not contemplate the prohibition of multiple punishments, but merely multiple prosecutions.[4]

However, the scope of the Double Jeopardy Clause has clearly been expanded by a line of cases beginning with *Ex parte Lange,* 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1874) to include multiple punishments. Recently, this expansion was again validated by the Supreme Court in *United States v. Halper,* 490 U.S. 435, 441, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487, 496 (1989), which held that the Double Jeopardy Clause protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense. *United States v. Halper,* 490 U.S., at 441, 109 S.Ct., at 1897; *see also North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). As in the *Halper* case, it is the third of these protections which is at issue here.[5]

In *Halper,* the Supreme Court held that under certain circumstances a civil penalty may be a punishment for purposes of the double jeopardy clause. *United States v.*

---

**4.** *See Department of Revenue of Montana v. Kurth Ranch,* —— U.S. ——, ——, 114 S.Ct. 1937, 1955, 128 L.Ed.2d 767 (1994) (Scalia, J., dissenting).

**5.** The Court notes that regardless of the order of the civil and criminal proceedings, the Double Jeopardy Clause will bar the second sanction if both the first and second sanctions are deemed punishment. *United States v. Tilley,* 18 F.3d 295, 298 n. 5 (5th Cir.1994); citing *United States v. Sanchez–Escareno,* 950 F.2d 193, 200 (5th Cir. 1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 123, 121 L.Ed.2d 78 (1992).

*Halper,* 490 U.S., at 447–448, 109 S.Ct., at 1901. The defendant in *Halper* was convicted on sixty-five counts of violating the criminal false-claims statute, specifically 18 U.S.C. § 287, by submitting fraudulent medicare claims. After Halper was sentenced to two years in prison and fined $5,000, the Government filed a separate civil action under the False Claims Act, 31 U.S.C. §§ 3729–3731, to recover a $2,000 civil penalty for each of the sixty-five violations. Notably, Halper's actions only netted him $585 in excess payments from the government and the district court estimated the government's costs at $16,000. In the subsequent civil action the government sought to impose an additional penalty of $130,000.

Much like the *Halper* case, the parties here do not dispute that Haywood has been punished as a result of his prior criminal proceeding when he was sentenced to a term of imprisonment, a term of probation, and fined $20,000. Nor is there much dispute that the instant civil proceeding and the subsequent criminal proceeding concern essentially the same conduct—the Langley bond transaction. The dispute arises over the issue of whether the civil penalty authorized by the money laundering statute, under which Haywood is subject to a liability equal to the amount of the funds involved in the transaction ($280,000), constitutes a second "punishment" for the purposes of double jeopardy analysis.

Defendant primarily relies on the Supreme Court's decision in *Halper* to support his contention that the civil penalty in this action represents retribution or is simply a deterrent, as the government has suffered no harm which will be remedied by assessment of the civil penalty. Defendant further states that no direct financial loss was suffered on account of Mr. Haywood's role in the bond transaction involving the alleged drug proceeds. Accordingly, so the Defendant's argument goes, the penalty sought by the Government is not remedial, and under

*Halper,* is barred by the Double Jeopardy clause as a second punishment.

The gist of the *Halper* decision is that a legislature's description of a statute as civil does not foreclose the possibility that it has a punitive character. *Department of Revenue of Montana v. Kurth Ranch,* —— U.S. ——, ——, 114 S.Ct. 1937, 1945, 128 L.Ed.2d 767 (1994). The Supreme Court reasoned that "a government-imposed sanction ... constituted punishment if—and only if—the sanction, 'as applied in the individual case serve[d] the goals of punishment,' that is, retribution and deterrence, instead of only the traditional remedial purpose of reimbursing the government for the costs incurred because of the defendant's wrongful conduct." *Halper* 490 U.S. at 448, 109 S.Ct. at 1899–1902.

More pointedly, the Court stated that a civil sanction constitutes criminal punishment only in the "rare case" in which the amount of the sanction is "overwhelmingly disproportionate" to the damages caused by the wrongful conduct and thus "bears no rational relation to the goal of compensating the government for its loss, but rather appears to qualify as 'punishment' within the plain meaning of the word." *Halper* at 449, 109 S.Ct. at 1902. The question then becomes, what costs or loss was incurred by the Government as a result of Haywood's actions in the money laundering scheme and does the sanction here bear a rational relation to compensating the government for such loss in a way which is not punitive. Although, at first glance there may appear to be an excessive disparity between the Government's actual damages and the civil penalty, for the reasons cited below, this Court does not believe that to be the case.[6]

▇ It is well settled that a person can be liable for conspiracy because he provides a central service to the criminal venture. *See United States v. Dela Esperiella* 781 F.2d 1432, 1436 (9th Cir.1986). Several courts have addressed laundering of illicit narcotics

---

**6.** This perception is particularly fitting if, like the Defendant, you are of the opinion that the Government has not suffered any loss or incurred any costs as a result of Defendant's actions. However, as noted by the Supreme Court, whether a sanction constitutes punishment is not deter-

mined from the defendant's perspective, as even remedial sanctions carry the "sting of punishment." 490 U.S., at 447, n. 7, 109 S.Ct., at 1901, n. 7 (*citing United States ex rel. Marcus v. Hess,* 317 U.S. 537, 551, 63 S.Ct. 379, 387, 87 L.Ed. 443 (1943)).

proceeds directly and have concluded that such activities may be integral to the success of a narcotics conspiracy. *See, e.g., United States v. Orozco–Prada,* 732 F.2d 1076, 1080 (2nd Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984); *United States v. Metz,* 608 F.2d 147, 153 (5th Cir. 1979), *cert. denied,* 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980). The Fourth Circuit has stated that "money laundering and drug trafficking are often intimately connected." *United States v. Tedder,* 801 F.2d 1437, 1447 (4th Cir.1986).

Here, while Defendant is not indicted as being part of the drug conspiracy which was ultimately brought to justice, his actions, as alleged, certainly facilitated the concealment and use of drug profits for purposes which were clearly related to the ultimate goals of the Arrendell–Purser drug organization, namely, the prevention of an underling from cooperating with the government and revealing the entire drug operation.

The Court believes that the legislature clearly authorized both a criminal prosecution as contemplated in subsection (a) and a civil penalty action as delineated in subsection (b) of the statute. Title 18 U.S.C. § 1956(a) and (b) (West 1994). Furthermore, there can be little doubt that the chief purpose of Title 18 U.S.C. § 1956(b) is remedial in nature, designed, in part, to provide for restitution to the government for money lost in illegal money laundering activity and also to reimburse the government for other ancillary costs such as the costs of detection and investigation, that routinely attend the Government's efforts to root out deception resulting from money laundering schemes. The civil penalty amount consisting of not more than "the value of the ... funds, ... involved in the transaction," or $10,000, is decidedly necessary in order to ensure that the Government will be made completely whole. *See* Title 18 U.S.C. § 1956(b)(1) and (2).

The Court also believes that the purpose of the civil penalty here is not to punish Haywood for retributive or deterrent purposes, but rather to recoup the loss from the money laundering scheme, which is a " 'legitimate nonpunitive governmental objective[ ].' " *De-partment of Revenue of Montana v. Kurth Ranch,* —— U.S., at ——, 114 S.Ct., at 1957, *citing Halper,* 490 U.S., at 448, 109 S.Ct., at 1901, *quoting Bell v. Wolfish,* 441 U.S. 520, 539, n. 20, 99 S.Ct. 1861, 1874, n. 20, 60 L.Ed.2d 447 (1979).

As Justice Kennedy noted in *Halper,* the controlling circumstance is whether the civil penalty imposed in the second proceeding bears any relation to the damages suffered by the Government. Here it clearly does, so it cannot be considered punishment for purposes of double jeopardy. *United States v. Halper* 490 U.S. at 453, 109 S.Ct. at 1904. Equally important, in light of the Supreme Court's proportionality concerns as expressed in *Halper,* is this Court's finding that the actual damage is the total loss amount of $280,000. The Court finds that the Government has successfully demonstrated how the civil penalty is remedial in this case stating that "defendants's efforts to hide the identity and source of the bond money and to further the drug trafficking conspiracy prevented forfeiture of the bond money as drug trafficking proceeds." Response of the United States to Defendant's Motion for Summary Judgment, at 4. Such forfeiture amount would have been the entire amount of the drug proceeds involved in the transaction. Therefore, in this case, the proper amount of the loss is the total amount of money involved in the bond transaction, all of which represented illegal drug proceeds.

The civil penalty in this case equates to the amount of proceeds lost because of the success of the money laundering conspiracy which was, to some unknown extent, connected to the drug conspiracy. According to the Government, this "success," resulting, in part, from Defendant's alleged efforts to conceal the identity and source of the bond money, prevented it from moving forward with a forfeiture action. Accordingly, this Court believes that, unlike the fine imposed in *Halper,* the civil penalty sought here is intended to compensate the Government for the loss of funds which would have been properly forfeited to the Government but for the money laundering activity.

There is little dispute that "[t]he forfeiture of proceeds of illegal drug sales serves the

wholly remedial purposes of reimbursing the government for the costs of detection, investigation, and prosecution of drug traffickers and reimbursing the government for the costs of combatting the allure of illegal drugs, caring for the victims of the criminal trade when preventative efforts prove unsuccessful, lost productivity, etc. *United States v. Tilley*, 18 F.3d, at 299; *see One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 237, 93 S.Ct. 489, 493, 34 L.Ed.2d 438 (1972); *Halper*, 490 U.S. at 444, 109 S.Ct. at 1900; *Rex Trailer Co. v. United States*, 350 U.S. 148, 153–154, 76 S.Ct. 219, 222 & n. 6, 100 L.Ed. 149 (1956).

Given the remedial nature found to exist for forfeiture of illegal drug proceeds, the Court finds that a penalty for any such action which prevents the Government or society from seizing the opportunity to obtain such illicit proceeds by way of forfeiture constitutes a loss, the compensation of which, is similarly remedial in nature. In *United States v. Ward*, 448 U.S. 242, 254, 100 S.Ct. 2636, 2644, 65 L.Ed.2d 742 (1980), the Supreme Court made clear that the compensation of both the government *and society* are remedial goals that a civil sanction may serve. In this case the sanction bears a substantial correlation to the damages sustained by society and the costs of enforcing the law.

The action here, of course, is the laundering of drug money. The Government correctly notes that subsection (d) of the money laundering statute "is especially pertinent to the consideration that most money to be laundered in violation of 18 U.S.C. § 1956 would be forfeitable if the Government were to overcome the efforts of the money launderers, determine the true nature of the cash as *e.g.*, drug trafficking proceeds, and seize the cash." Response of the United States to Defendant's Motion for Summary Judgment, at 4.[7]

 This Court finds that the proper test to be applied in determining whether the money laundering statute is penal or remedial in this case is whether it primarily seeks to impose an arbitrary, deterring punishment upon statutory violators, or whether the purpose is to assess and designate the damages which may accrue to the government or society, as just and reasonable compensation for a possible loss having a causal connection with the statutory violation. In this case, the Court finds that the purposes of § 1956(b) are explicitly remedial, designed to measure and define damages and provide reasonable compensation to the Government for its loss caused by Defendant's conduct.

The Court believes that the civil penalty in this case, which represents nothing more than the exact loss to the government, simply cannot be considered "overwhelmingly disproportionate."[8] The Supreme Court has recognized that intangible and immeasurable costs to the government are appropriate considerations in determining whether a sanction is remedial or punitive. *Rex Trailer Co. v. United States,* 350 U.S., at 154, 76 S.Ct., at 222. In this case, the $280,000 represents only a small portion of the total proceeds that

---

**7.** Subsection (d) provides, "[n]othing in this section shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this section." Title 18 U.S.C. § 1956(d) (West 1994).

**8.** The Court again notes the loss amount of $280,000 represents the proceeds which the government could not obtain through forfeiture because of the money laundering operation. It does not factor in the additional expenditures from legitimate nonpunitive interests such as defraying the cost of detecting, investigating, prosecuting, incarcerating, as well as costs associated with drug abuse education, deterrence and treatment. Accordingly, even if the loss resulting from the government being deprived of the forfeiture opportunity were not considered remedial, the Government would still be justified in assessing a civil penalty in proportion to the expenditures noted above. Given the vast sums of money spent by State and Federal Governments on drug control activities and the size of the Arrendell–Purser drug conspiracy, the fine involved here is simply not disproportionate to the damages caused by the wrongful conduct. *See Kurth Ranch,* —— U.S., at ——, 114 S.Ct, at 1953 (O'Connor, J., dissenting) (providing examples of the expenses associated with drug control activity—approximately $27 billion in fiscal year 1991); *United States v. Tilley,* 18 F.3d, at 299 (summarizing various sources which estimate that illegal drug sales produce approximately $80 to $100 billion per year while exacting $60 to $120 billion per year in costs to the government and society).

the Arrendell–Purser drug organization produced prior to and, more importantly, following this transaction involving the Defendant. Thus, the $280,000 is likely insufficient to totally compensate the government and society for the wrongs done. *See United States v. Tilley,* 18 F.3d, at 299.

In this case the Government claims it would have sought forfeiture of the drug proceeds in the possession of the Arrendell–Purser drug organization had it been able to timely determine the bond money was drug trafficking proceeds. Such a seizure would have taken place, not solely for the purposes of compensating itself for any costs of investigation or prosecution, but more importantly, to remove what had become a harmful instrumentality, drug money, from the hands of the drug organization. The public danger that the money posed in the hands of these drug dealers is evident.

Equally evident is the fact that removal of the instrumentality is not primarily an act of punishment; rather, a way to protect the community from the threat of continued drug dealing. *See United States v. Cullen,* 979 F.2d 992, 995 (4th Cir.1992). This logic has been applied by several circuits to reach the conclusion that the Double Jeopardy Clause does not apply to civil forfeitures. *Id.* at 995; *United States v. McCaslin,* 959 F.2d 786, 788 (9th Cir.1992); *United States v. 38 Whalers Cove Drive,* 954 F.2d 29, 36 (2d Cir.1992). In light of these decisions, this Court believes, under the facts of this case, that it is proper to extend such reasoning to include an action which prevents the Government from seizing the illegal drug proceeds through a civil forfeiture.

▮ In sum, because the purposes of civil forfeiture, often in addition to criminal sanctions, are deemed remedial, then the assessment of a civil penalty against one whose actions prevent the Government and society from obtaining the benefit of such forfeiture, is equally remedial. The Court concludes that the civil penalty here is more remedial than punitive and is therefore, not barred under the double jeopardy principles delineated in *Halper.*[9] For these reasons, Defen-

dant's motion for summary judgment must be denied.

## 2. Scienter Issues

The second principal issue before the Court is whether Haywood had the requisite statutorily defined knowledge that the proceeds in this transaction were from illegal activity and that the transaction was designed to conceal or promote the carrying on of unlawful activity. There is little dispute that certain elements of the offense have been met, namely, that a financial transaction occurred and that the property was, in fact, proceeds of a specified unlawful activity. Title 18 U.S.C. § 1956(c)(4, 7). It is also undisputed that Haywood knew of the bond transaction and participated to some extent in that transaction.

▮ Beyond this however, the evidence before the Court becomes less clearcut and more ardently disputed by the parties. Fortunately for Defendant, so long as there is the "slightest doubt as to the facts," a genuine issue of material fact exists and summary judgment is inappropriate. *See Pierce v. Ford Motor Co.,* 190 F.2d 910, 915 (4th Cir.1951). Here, genuine issues of material fact concerning Haywood's *mens rea* do exist.

Federal Rule of Civil Procedure 56(d) provides that when a summary judgment motion is denied, the court is to determine, "if practicable ... what material facts exist without substantial controversy and what material facts are actually and in good faith controverted." The Court's review reveals the following evidence which is almost uncontroverted, namely, (1) that Haywood knew Purser was a friend or associate of Arrendell; (2) that Haywood had represented Arrendell in a drug case previously; (3) that Haywood knew Purser was able to obtain $280,000 in less than thirty minutes; and, (4) that the purpose of getting the money and arranging the bond was to release a "friend" (Langley) who Haywood knew had been charged with drug trafficking over a kilo of cocaine.

---

**9.** As noted by the Defendant, the government is entitled to remedial justice without being deemed to have imposed a second punishment. *Halper,* 490 U.S. at 444–46, 109 S.Ct. at 1900.

However, despite these facts and the import of inferences which might be drawn from them, there is additional debate as to Haywood's knowledge about the details of the transaction. The record before the Court is unclear regarding the extent Haywood was actually involved in the arrangements or whether he was aware of the covert plan which was designed to keep the source of the money, Purser, concealed. There is also some question of fact concerning Haywood's role in, or awareness of, the manner in which the transaction actually went down.

In making this determination, the Court is bound by the traditional allocation of functions between judge and jury. These functions were aptly described by the Supreme Court in *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), which stated:

> Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,.... The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.

Accordingly, given the nature of the evidence in this case, consisting principally of ambiguous and somewhat contradictory affidavits and depositions, the Court believes the best course in this matter is to proceed to trial. Accordingly, the Government's motion for summary judgment is denied.

**NOW, THEREFORE, IT IS ORDERED** that Defendant's motion for summary judgment be, and hereby is, **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's cross-motion for summary judgment be, and hereby is **DENIED.**