**Rose STITH, Plaintiff,**

v.

**Fabian THORNE, et al., Defendants.**

**Civil No. 3:06CV240.**

United States District Court,
E.D. Virginia,
Richmond Division.

Nov. 26, 2007.

show cause why the remaining claims should not be recast into eight separate actions.

Dale Wood Pittman, The Law Office of Dale W. Pittman, Petersburg, VA, Thomas Dean Domonoske, Law Office of Dale W. Pittman, Harrisonburg, VA, for Plaintiff.

Fabian Thorne, Newark, NJ, pro se.

Anna K. Essex, Newark, NJ, pro se.

Virginia Margaret Sadler, Carol Thomas Stone, John O. Easton, Jordan Coyne & Savits LLP, Fairfax, VA, Godfrey Thadeus Pinn, Jr., Harrell & Chambliss LLP, Robert Edley, Jr., Richmond, VA, for Defendants.

## MEMORANDUM OPINION

DENNIS W. DOHNAL, United States Magistrate Judge.

This matter is before the Court on Plaintiff Rose Stith's (Stith) motion for partial summary judgment (docket entry no. 106), and Defendants Southern Central Title, L.L.C.'s (SCT) and Sharon S. Linari's (Linari) motion(s) for summary judgment (docket entry no. 108). Oral arguments on the motions were held on October 16, 2007. The motions are ripe for resolution. For the reasons set forth herein, the motions are DENIED.

### I. Factual Background

Stith, delinquent on her bills, decided to refinance her home to avoid possible bankruptcy and to give her the opportunity to pay her creditors. (Compl. ¶¶ 11–12, 29.) Defendant Fabian Thorne (Thorne), an employee of Defendant Sparrow Enterprises International, Inc., d/b/a/ Prestige Mortgage (Prestige), contacted Stith and offered to assist her in solving her financial problems. (Compl. ¶¶ 20–21.) Thorne informed Stith that his plan would improve her credit and leave her with a refinanced home on favorable terms. (Compl. ¶ 30.) After their initial conversation, Stith agreed to accept Thorne's assistance to resolve her debt problems. (Compl. ¶¶ 24, 31.) Thorne told Stith to contact Defendant Sterling Palmer (Palmer), who worked for both Prestige and American Credit Solutions, L.L.C. (ACS). (Compl. ¶¶ 21, 25–26.) The plan required Stith to transfer title to her home on the condition that she could re-purchase it after a year with a refinanced loan after improvement of her credit rating with the assistance of ACS, a credit repair company. (Compl. ¶ 54.)

In essence, Stith thought the proposal was that Thorne would pay her debts, that title to her home would be held for one year by Friday while she continued to live there and worked to improve her credit rating with the assistance of ACS (Compl. ¶¶ 6, 57), that at the end of the one year she would be given a refinanced loan to reimburse Thorne the amount of the indebtedness that was paid on her behalf, and that everything would be

done legally. (Compl. ¶ 48.) Stated another way, Stith, while remaining in her home, would convey title of her home to Friday who would agree to sell the home back to her once her credit score had improved and she had qualified for a new acquisition loan with the assistance of ACS.

Stith agreed to the plan. (Compl. ¶ 31.) On September 16, 2005, Stith and Friday signed a document entitled "General Contract" that provided for the sale of Stith's home to Friday and the eventual re-sale of the home back to Stith. (Compl. ¶ 41 & Ex. J.) Stith also signed a Central Virginia Regional MLS Purchase Agreement in which she agreed to sell her home to Friday for $125,000. (Baltimore American Mortgage Corp.'s (BAMC) Mem. Supp. Mot. Summ. J ("BAMC's Mem.") at 4, ¶ 16 & Ex. B (docket entry no. 72.)) The document also provided, however, that Friday (as the purchaser) would not occupy the property as his principal place of residence. (*Id.*) Stith also paid ACS $350.00 for its credit repair services. (Compl., Ex. M.)

On September 29, 2005, Stith conveyed her home (the "Property") to Friday by deed dated September 28, 2005. (Compl. ¶ 49; BAMC's Mem., Ex. A.) To finance the acquisition of the Property, Friday (through broker Prestige) obtained two loans from BAMC—one in the amount of $94,400 (the "First Friday Loan"), and a second one in the amount of $23,600 (the "Second Friday Loan"), for a total amount of $118,000 (collectively, the "Friday Loans"). (BAMC's Mem. at 2.) Each loan was secured by a lien deed of trust on the Property. (*Id.*)

SCT was to provide and conduct the settlement for the supposed sale of Stith's home to Friday. (Compl. ¶¶ 34, 58.) An SCT employee conducted the closing. (Compl. ¶ 34.)[1] Linari signed a HUD–1 Settlement Statement (which itemized all charges imposed in connection with the transaction) at the closing for the First Friday Loan on behalf of Stith pursuant to a Specific Power of Attorney obtained from Stith. (Compl.

¶¶ 35–36 & Ex. F.) The Power of Attorney was to be utilized for the execution of all documents necessary "for the consummation for the refinance of Stith's home, and further indicated that "[t]his power of attorney is for the consummation of the real estate transaction for the purchase and settlement of the property[.]" (Compl., Ex. G.) It specifically appointed Linari as "the true and lawful attorney for" Stith to sign the closing documents on Stith's behalf. (*Id.*) Thus, the undisputed evidence demonstrates that Stith authorized Linari—as Stith's attorney-in-fact—to sign the documents necessary to settle and close on the sale of her home to Friday. Moreover, a paper entitled "Forfeit of Proceeds Document" that was signed by Stith and maintained by SCT during the settlement process named Thorne as the creditor (and authorized the direct payment of the proceeds from the sale of Stith's home to him), but it did not list the amount of money that he was to receive. (Compl. ¶ 47 & Ex. O.) Nevertheless, Stith alleges that Linari, on behalf of SCT, intentionally misrepresented the manner in which she would use the Power of Attorney and that she concealed the HUD–1 Settlement Statement to prevent Stith from learning how much Thorne was to receive in the settlement, thus preventing Stith from discovering the existence of what's alleged to be a predatory lending scheme. (Compl. ¶¶ 81–83.) She also maintains that the omission on the Forfeit of Proceeds Document as to how much Thorne was to receive could reasonably be viewed as an intentional and fraudulent act by the Defendants to conceal how much money Thorne would actually receive from the sale of the home.

As reflected in the HUD–1 Settlement Statement, Stith's previous mortgage holder received a payoff of $57,893.04. (Compl. ¶ 40 & Ex. F, line 504.) Prestige received a check for $1,514.00 for closing costs (*id.* at lines 801, 804, and 805), and Thorne received a check for $55,640.76, which was understood

---

1. The Complaint alleges that Linari conducted the closing. (Compl. ¶ 34.) However, by way of affidavit, Linari attested that she "did not conduct the closing ... when Rose Stith sold her house to Roscoe Friday," and that this closing was conducted by another employee of SCT. (SCT's Resp. to Pl.'s Mot. for Partial Summ. J. and Cross Mot. for Partial Summ. J. ("SCT's Resp."), Ex. 1 ("Linari Aff.") ¶ 2 (docket entry no. 80.))

by Stith to be used for the payment of her debts. (*Id.* at line 518.) Stith has also acknowledged in deposition that she assumed Thorne was to be paid something for his services, and, indeed, such an expectation is reflected in her execution of the Forfeit of Proceeds Document. Friday thereafter received title to Stith's home.

In regard to the $55,640.76 paid directly to Thorne, none of those funds were provided to the broker, Prestige. (BAMC's Mem. at 6, . & Ex. I.) Stith stated that she received only $9,500 (BAMC's Mem., Ex. C ("Stith Dep.") 128:1–13), while Friday received $20,000 (SCT's Resp., Ex. 7 ("Friday Dep.") 34:23–36:20 (docket entry no. 80.)) According to Friday, he received two distinct payments: a $10,000 payment for buying Stith's home, and another $10,000 payment to be used toward payment of the mortgage. (*Id.*) Both payments were made by Thorne. (*Id.*) Both BAMC (as the lender) and SCT (as the settlement agent) assert they were unaware of the payments made to either Stith or Friday. (BAMC's Mem. at 6, ¶ 33; SCT's Resp. at 2.) Friday now holds title to Stith's home and seeks to evict her.

## II. Procedural History

Stith filed a ten-count Amended Complaint (the "Complaint") against Defendants Thorne, Anna K. Essex ("Essex"), Palmer, Friday, Linari, Prestige, ACS, SCT, BAMC, and Lehman Brothers Bank FSB ("Lehman Brothers") (docket entry no. 64.) Stith alleges violations of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.* (2000), the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* (2000), the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.* (2000), the Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1679 *et seq.* (2000), and various violations of Virginia statutory and common law.[2] (Compl. ¶¶ 70–102.) The

Complaint essentially alleges that the refinancing plan was actually a predatory lending scheme by which Defendants conspired to steal the equity in Stith's home.[3]

Stith seeks statutory, compensatory, treble, and punitive damages, as well as the creation of a constructive trust in her favor. She also seeks awards for her attorneys' fees and costs. On May 29, 2007, the Court entered a Memorandum Opinion and Order, 488 F.Supp.2d 534, which dismissed all claims against SCT and Linari, other than Stith's claims that SCT violated the Virginia Consumer Protection Act ("VCPA"), and the claims of common law fraud and common law conspiracy against SCT and Linari.

The matter is currently before the Court on Stith's motion for partial summary judgment against SCT on the VCPA claim, SCT's cross-motion for summary judgment on the VCPA claim, and SCT and Linari's motion for summary judgment on the common law fraud and common law conspiracy claims.

## III. Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering whether to grant a motion for summary judgment, the court must assess the evidence offered by both parties and "determine whether there is a genuine issue for trial" after viewing the evidence in the light most favorable to the non-moving party and resolving all factual disputes in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must "resolve all factual disputes and any competing, rational inferences in the

2. Namely, violations of the Virginia Credit Services Business Act, Va.Code Ann. § 59.1–335.1 *et seq.* (2006 Repl. Vol.), the Virginia Consumer Protection Act, Va.Code Ann. § 59.1–196 *et seq.* (2006 Repl. Vol.), common law fraud and conspiracy, as well as violation of the Virginia Wet Settlement Act, Va.Code Ann. § 6.1–2.10 *et seq* (1999 Repl. Vol. & Cumm. Supp.2006).

3. The Clerk has entered default against Essex (docket entry no. 39), Thorne, Palmer, and ACS for their failure to respond (docket entry no. 56). Such a circumstance is significant because Thorne and Palmer were the creators, facilitators, and major "players" in the alleged predatory lending scheme.

light most favorable" to non-moving party. *Id.* (citation omitted). Nonetheless, this Court is not to make credibility determinations, as that task is for the fact finder. *Id.*

To defeat a summary judgment motion, the non-moving party may not rest upon mere allegations or denials, but must "set forth specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Furthermore, a party may not avoid summary judgment by relying on affidavit evidence that seeks to contradict earlier deposition testimony of the same party:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiffs testimony is correct.

*Barwick v. Celotex Corp.,* 736 F.2d 946, 960 (4th Cir.1984) (internal quotations and citations omitted). In essence, the Court must decide if the evidence when viewed in the light most favorable to the non-moving party "presents a sufficient disagreement to require submission to the [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

### IV. Summary of Claims Before the Court

#### 1. *Virginia Consumer Protection Act Claim*

In Stith's Memorandum in Support of her Motion for Partial Summary Judgment, she argues that SCT willfully violated the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1–200(A). (Mem. in Supp. of Pl.'s Partial Mot. Summ. J. ("Pl.'s Mem.") at 9–11.) Specifically, Stith claims that Defendant SCT willfully violated the VCPA based on SCT's payment of $55,956.29 to Thorne in the absence of any written instruction that authorized the payment. (*Id.* at 10–11.) As a result of the payment, Stith lost $46,456.29 of the equity in her home. (*Id.* at 10.) Stith claims that SCT acted in a deceptive manner by failing to provide Stith with a copy of the HUD–1 settlement statement (Pl.'s Opp'n B. to Defs' Second Mot. Summ. J. ("Pl.'s Opp'n") at 15–16), and by disbursing money to Thorne pursuant to the Forfeit of Proceeds Document signed by Stith, and the HUD–1 settlement statement signed by Linari pursuant to a Specific Power of Attorney. (Pl.'s Mem. at 9–11.) Stith contends that the Forfeit of Proceeds document cannot constitute valid written authorization because the form contained a blank space where it was to specify the amount of money to be paid to Thorne. (*Id.*)

Stith also argues that a violation of a consumer statute elsewhere in the Virginia Code also constitutes a violation of the VCPA. (Pl.'s Mem. at 8.) Stith raises the claims that SCT violated the Consumer Real Estate Settlement Protection Act ("CRESPA"), Va. Code Ann. § 6.1–2.23, and the Mortgage Lender and Broker Act ("MLBA"), Va.Code Ann. § 6.1–422(A)(1), and as a result of SCT's violations of these parts of the Code, SCT thereby violated the VCPA. (*Id.* at 8–9).

Stith claims that SCT violated the Mortgage Lender and Broker Act because the Forfeit of Proceeds Document amounted to a prohibited predatory practice by a mortgage broker. Stith contends that SCT's actions were willful because SCT and Linari knew that Thorne was not receiving money for the purposes stated in the Forfeit of Proceeds document, and that he was a mortgage broker for Prestige Mortgage who was receiving an extra payment on a line other than where disclosure of payments to a mortgage broker are to be disclosed. (*Id.* at 9.)

Stith also claims that SCT violated CRESPA because that Code section requires that a settlement agent hold funds in a fiduciary capacity, and that the funds can only be distributed pursuant to written instructions. (*Id.* at 8–9.) Stith claims that SCT violated CRESPA, and thus, the VCPA, by distributing funds to Thorne without valid written instruction. (*Id.*)

SCT contends in response that it did not violate the VCPA, because a violation of CRESPA or the Mortgage and Lender Act provides no concurrent basis for a VCPA violation. (Br. of Def. in Opp'n to Pl.'s Mot. for Partial Summ. J. ("Def.'s Opp'n") at 9–13.) In other words, SCT contends that there is no catch-all provision that implicates the VCPA if other consumer protection statutes are also violated. (*Id.*) SCT emphasizes that Stith presents no evidence that it used any deception, fraud, false pretense, false promise, or misrepresentation in connection with the closing it conducted for the sale of Stith's home to Friday. (*Id.* at 7.) SCT asserts that its understanding was that Thorne was to receive the seller's proceeds so that he could pay Stith's bills for a year and repair her credit in order for her to "buy back" her house. (*Id.* at 12.) SCT claims that there is no evidence that SCT or Linari had a pre-existing arrangement with Thorne pursuant to which it could calculate in advance the precise amount Thorne was to receive. (*Id.*)

SCT further argues that even if a violation of CRESPA could constitute a violation of the VCPA, SCT did not violate the CRESPA because CRESPA does not provide for a private cause of action. (*Id.* at 9–10.) SCT also argues that it was authorized to disburse the seller's proceeds to Thorne, as provided in the Forfeit of Proceeds Document signed by Stith which authorized the payment of the seller's proceeds to be made directly to Thorne. (*Id.* at 9.) The HUD–1 settlement statement, signed by Linari on behalf of Stith pursuant to a Specific Power of Attorney signed by her (which the Court has already held was proper), authorized SCT to disburse the seller's proceeds to Thorne. Defendant accordingly argues that the documents met the requirement under the CRESPA for "a written instruction or agreement." (*Id.*)

Finally, SCT asserts that the MLBA provides no basis for a VCPA violation by SCT because SCT did not deliver Stith's money to a mortgage broker. (*Id.* at 11–13.) As with CRESPA, SCT also contends that there is no private right of action for a violation of the MLBA. (*Id.* at 12.)

### 2. *Common Law Fraud Claim*

In Count VII of the Amended Complaint, Stith alleges that Linari, on behalf of SCT (hereinafter collectively "Defendants"), intentionally misrepresented to Stith that she would use the Power of Attorney to complete refinancing and to execute necessary documents for the refinancing as proposed by Thorne. (Am. Compl. ¶ 81.) Stith further alleges that Linari, on behalf of SCT, intentionally concealed from her the HUD–1 that Linari was required by federal law to make available to Stith at least one day prior to closing, thereby concealing from Stith the amount of money to be disbursed to Thorne. (*Id.* at ¶ 82.) Stith further alleges that she relied on these "misrepresentations" and such reliance induced her to sign the documents presented to her by the Defendants that resulted in harm to her because of her reliance on such misrepresentation. (*Id.* at ¶¶ 85 & 86.)

Stith's allegations that the HUD–1 settlement statement was intentionally withheld from her, and that Linari's power of attorney was misused, are mere conclusory allegations for which Stith offers little to no factual or legal support indicating that such actions constituted common law fraud. In her response brief, Stith raises an argument that she claims demonstrates fraud on the part of SCT and Linari. Specifically, Stith argues that under the Power of Attorney, Linari had fiduciary duties and responsibilities that she owed to her. (Pl.'s Opp'n at 19.) She states that a fiduciary's duty under a Power of Attorney shifts the burden of proof once a presumptively fraudulent transaction is demonstrated. (*Id.*) In other words, Stith is claiming that because the entire predatory lending scheme was a "presumptively fraudulent" transaction, the burden of proof is on the Defendants to prove that their involvement in the transaction did not constitute fraud. (*Id.*)

### 3. *Common Law Conspiracy Claim*

In the final claim by Stith against SCT and Linari, Stith claims that Defendants "worked together [with Thorne, Essex, Palmer, Prestige, and ACS] to unlawfully perpetrate a

predatory scheme to target and steal the equity in Mrs. Stith's home." (Am. Compl. ¶ 87.) Specifically, Stith contends that Defendants participated in the conspiracy when they:

> worked with Fabian Thorne to develop the method by which Thorne submitted documents to them with blanks where the dollar amount would go, and Defendants would then determine the amount of money that would be given to Thorne.... Additionally, Defendants agreed to close the loan that Thorne wanted closed even though they knew that Thorne, not Roscoe Friday, brought the money to the table that the lender required to come from Friday.... Because Defendants knew that Roscoe Friday did not bring the money to closing that was disclosed on the HUD–1 statement as his money, Defendants also knew or should have known that the transaction violated Va.Code § 18.2–186's prohibition against false statements to obtain property or credit.

(Pl.'s Opp'n at 23.)

## V. Analysis

"Summary judgment is appropriate only where no material facts are genuinely disputed and the evidence from the entire record could not lead a rational fact finder to rule for the non-moving party." *United States v. Haywood*, 864 F.Supp. 502, 505 (W.D.N.C. 1994) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The Court will first address Stith's contention that the VCPA contains a "catch-all" provision which provides that a violation of any consumer statute found in the Virginia Code also constitutes a violation of the VCPA. The issue is a legal, not factual one.

In support of her argument, Stith cites the case of *Valley Acceptance Corp. v. Glasby*, 230 Va. 422, 337 S.E.2d 291, 297 (1985), contending that it holds that a violation of a consumer protection statute found elsewhere in the Virginia Code is also a violation of the VCPA. (Pl.'s Mem. at 8.) As Defendant emphasizes, the court in *Glasby* does *not* hold that a violation of any consumer statute found in the Code also constitutes a violation of the VCPA. In *Glasby*, the defendant was liable for violating the Small Loans Act. On appeal, the defendant contended that there was no basis for the trial court's award of attorneys fees against it under the VCPA. Such attorneys fees were awarded, however, because the trial court determined that the defendant specifically violated portions of the VCPA; namely, § 59.1–200(F) and (N). At no point does the *Glasby* court hold that a violation of any consumer protection statute in the Virginia Code also constitutes a violation of the VCPA.

Stith then points to the language of the VCPA itself, and contends that subsection 14 of the VCPA is the "catch-all" provision. Subsection 14 of the VCPA states:

> (A) The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful;
>
> (14) Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

Va.Code Ann. § 59.1–200(A)(14). However, the subsection, as well as the remainder of the VCPA and existing case-law, does *not* support Stith's proposition that a violation of *any* consumer statute in the Virginia Code also constitutes a violation of the VCPA.

Stith has misconstrued the *Glasby* case in contending that by offering proof that Defendant violated the CRESPA and the MLBA, Defendant SCT can also be found to have violated the VCPA. Clearly, a violation of CRESPA or the MLBA does not also necessarily constitute a violation of the VCPA. Furthermore, to the extent that Stith attempts to raise separate claims against Defendants pursuant to CRESPA and the MLBA, such claims must also fail because neither CRESPA or the MLBA provide for private causes of action. CRESPA, by its

own statutory language, is clear on the issue. Va.Code § 6.1–2.19(B).[4] Stith is an individual and not a licensing authority; therefore she cannot pursue a private cause of action under CRESPA. Similarly, the MLBA only applies to lenders and mortgage brokers, and, therefore, it also does not provide for a private cause of action.[5]

■ Therefore, to the extent that Stith argues that a violation of any consumer statute in the Virginia Code also constitutes a violation of the VCPA, the argument fails. Additionally, to the extent Stith claims that Defendants violated the CRESPA or the MLBA, such arguments must also fail where neither statutory scheme allows for a private cause of action. Accordingly, partial summary judgment must be GRANTED to Defendants SCT and Linari on Stith's claim that a violation of another consumer statute in the Virginia Code also constitutes a violation of the VCPA, and on Stith's CRESPA and MLBA claims against Defendants. Dispositive relief, however, must be denied on the remaining issues because of the existence of disputed material fact.

■ The first dispute of material fact concerns the significance of the blank on the Forfeit of Proceeds Document. The parties disagree over the significance of the blank. Stith claims that the signed document containing the blank did not provide implied authorization for SCT or Linari to give $45,000 of her equity to Thorne. Defendants, in response, argue that the blank constituted authorization by Stith to deliver *all* of her proceeds to Thorne.

Another disputed material fact concerns whether SCT and Linari had a pre-existing arrangement with Thorne. Stith argues that in Linari's deposition, she testified she had discussed intended procedures with Thorne. Stith asserts that Thorne had a pre-existing arrangement with Linari and SCT whereby SCT agreed that when it got the Forfeit of

Proceeds document with a blank space on it, SCT would determine how much equity the person had, designate the dollar amount, and pay the amount directly to Thorne. In oral argument, Stith's attorney referred to an earlier attempt by Thorne to execute such a scheme that was unsuccessful and his subsequent conversation with Linari when they allegedly devised the plan to, in effect, steal the equity in Stith's residence. Defendants respond that there is no evidence that either SCT or Linari ever entered into an agreement to violate the MLBA, or that there was any pre-existing arrangement to do anything that would be in violation of any law. According to Defendants, SCT understood, at most, that Thorne was to receive the seller's proceeds so he could pay Stith's bills for a year in order to repair her credit which would enable her to buy back her house and that SCT understood such a process to be legal. SCT admits that it was aware that after a year, it was intended that Stith would be in a position to obtain the loan she needed to re-purchase her house, but that it knew nothing beyond that, including anything about an illegal or improper intention on the part of Thorne.

Such disputed facts are material to the matter because they pertain to the issue of whether SCT *willfully* violated the VCPA by paying $55,956.29 to Thorne in the absence of any written instruction that authorized the payment. Such disputed facts are also material because they impact on the issue of whether a pre-existing agreement existed between Thorne and Linari/SCT. Stith contends that SCT was presented the Forfeit of Proceeds Document which, on its face, is a predatory practice because it contained a blank which was to be filled in later. Stith states that instead of referring the matter to proper authorities, SCT instead completed the transaction pursuant to a pre-existing and illegal agreement. In opposition, SCT

---

4. Va.Code § 6.1–2.19(B) states that CRESPA's purpose is to "authorize existing *licensing authorities* in the Commonwealth of Virginia to require persons performing escrow, closing, or settlement services to comply with certain consumer protection safeguards relating to licensing, financial responsibility and the handling of settlement funds." (emphasis added).

5. Va.Code § 6.1–422 provides that "[n]o *lender or broker* under this chapter shall . . .", and then lists a number of predatory practices in which lenders and mortgage brokers, not private individuals, are prohibited from engaging.

and Linari claim that because Stith signed the Forfeit of Proceeds Document, and because there was a blank, she was authorizing all of her proceeds to be delivered to Thorne. SCT argues that while it is a prohibited practice to obtain an agreement in which blanks are left to be filled in after execution, the blank remained blank—nothing was ever added after execution. A trier of fact must determine the significance of the blank space on the Forfeit of Proceeds document, and whether such blank constitutes a willful violation of the VCPA by SCT and Linari. Further, a trier of fact must decide whether SCT or Linari had actual knowledge of Thorne's scheme, and whether they entered into an illegal agreement with Thorne to defraud Stith and steal the equity in her home. The resolution of these disputed facts is necessary because the facts are material to all of Stith's remaining claims against SCT and Linari; specifically, whether SCT violated the VCPA, and whether SCT and Linari engaged in common law fraud and common law conspiracy.

Yet another dispute of material fact is whether Stith saw or received a copy of the HUD–1 Settlement Statement, and, if not, whether it was purposefully concealed from her as part of a scheme to defraud her. Stith claims that SCT and Linari used the Specific Power of Attorney to prevent her from knowing how much money was paid to Thorne. Defendants essentially admitted at oral argument that a dispute of fact does exist as to the issue. At the same time, Defendants claim that there is nothing improper or illegal about what they did in the closing of Stith's real estate transaction. That conclusion, however, must be left for the fact finder to reach.

The parties further dispute whether or not Stith understood that Thorne was to be given $45,000 of the equity in her home. Both parties cite to Exhibit P of the Complaint, a handwritten note by Stith, in support of their contentions. Defendants claim that the document proves that Stith knew, before closing, that she was going to receive only $10,000 and that Thorne would receive the rest of the proceeds. Stith contends to the contrary that her written statement of "10k to me"

meant she would get $10,000 of her equity in cash to her at closing, but that the rest of her equity would also remain hers.

Each of these issues are premised on disputed, material facts that relate to the larger issue of whether Stith had knowledge that SCT would pay to Thorne all of the seller's proceeds. The trier of fact must decide whether SCT and Linari acted fraudulently and as part of a conspiracy when they obtained the Specific Power of Attorney from Stith and used the same to sign the HUD–1 Settlement Statement. Stated another way, it must be decided whether such actions were undertaken merely in the ordinary course of SCT's business, or whether they were committed to intentionally conceal from Stith the fact that all of the balance of the sale proceeds were being given to Thorne. Such disputed facts are material because their resolution determines whether SCT and Linari engaged in common law fraud and common law conspiracy.

For the reasons discussed herein, partial summary judgment is GRANTED to Defendants SCT and Linari on Stith's claim that a violation of any consumer statute in the Virginia Code also constitutes a violation of the VCPA, and on Stith's individual CRESPA and MLBA claims against Defendants. As to the request(s) for dispositive relief on the remaining claims, Stith's motion for partial summary judgment (docket entry no. 106), as well as Defendant's motion(s) for summary judgment (docket entry no. 108) must be DENIED because of the existence of disputed material facts.

An appropriate Order shall issue.